Adam Sanderson
Texas Bar No. 24056264
*(Will comply with LR IA 11-2 within 1 day)*
adam.sanderson@rm-firm.com
Brett S. Rosenthal
Texas Bar No. 24080096
*(Will comply with LR IA 11-2 within 1 day)*
brett.rosenthal@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
Telephone: 214.382.9810
Facsimile: 214.501.0731

Gregory H. King
Nevada Bar No. 7777
gking@kingdurham.com
Matthew L. Durham
Nevada Bar No. 10342
mdurham@kingdurham.com
KING & DURHAM PLLC
6385 S. Rainbow Blvd., Suite 220
Las Vegas, Nevada 89118
Telephone: (702) 833-1100
Facsimile: (702) 833-1107

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| KENNETH LANE, LUIS MARTINEZ, THOMAS DURLIAT, BENITA LUKE, DAVID KENNEY, ADINA LAWSON, ALLEN FORD, WILLIAM DOUBEK, MARY KAY DOUBEK, EDWIN P. CARTER AND MARY R. CARTER 1998 REVOCABLE LIVING TRUST, MICHI SATO, PHILIP STARK, STARK-BAUMGARTNER TRUST, PATRICK AMORIELLO, LOUANN SPIEGEL, JODIE BAEDEKER, EBERLE FAMILY TRUST, REN BEVELL, KAREN MILES, GARY MUSACCO, ROSALYN MUSACCO, OLIPHANT FAMILY CHARITABLE REMAINDER TRUST 11-11-14, STEPHEN RAGSDALE, LESLIE REED, CHET REILLY, WILLIAM SPAAK, ROBERT SPAAK, WHALE PLANET MEDIA INC. DEFINED BENEFIT PLAN, HALLIE ALDRIDGE, NORMAN CHRISTIANSON, ELLEN CHRISTIANSON, MARGARET | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

COWENS, JOHN DANCASTER, DAVID GREENFIELD, LAURIE GREENFIELD, RICHARD GUIRY, LYNN CORWIN-HERNANDEZ, KEITH JAROSLOW, LISA JAROSLOW, DEATRA LANE, JILL MCGOVERN, GARNETT S. WILLIAMS TRUST, LOWELL ORREN, JED FIREBAUGH, KAREN WILEY, BARBARA CARRILLO, LINDA MACTAGGART, DENNIS BLOUGH, CAROLYN DEMERY, ROBERT AND KAREN ZEITZER TRUST, GREGORY WEISS, STEVEN BLAUVELT, GAY SATO, TURNER FAMILY CHARITABLE REMAINDER TRUST, TURNER PROPERTY INVESTMENTS, LLC, ECONOMICS AND POLITICS INC. RETIREMENT 401K PLAN, JAMES F. TRICE REVOCABLE LIVING TRUST 1 AND 2, THE ESTATE OF MICHAEL HICKEY, CHARLES ANDERSON, JOHN ANKER, KATHY ANKER, BARBARA OGILVIE, KAREN HUNT, LARRY LYCETT, HELGA BAKER, JAMES SLATER, MICHAEL C. JACKSON, INGRID JACKSON, ROGER MACLEOD, DEBORAH KIRBY, BRIAN CRAVEN, MICHAEL RICCATONE, JULIE RICCATONE, BLACK HAWK FUNDING, INC., W. DAVID BLACKBURN, KARLENE BLACKBURN, LAWSON FAMILY BYPASS TRUST, PAMELA CHERRY, JANET CHEEK, and DOUGLAS CHEEK, individually and on behalf of a class of similarly situated persons,

Plaintiffs,

v.

CONESTOGA SETTLEMENT SERVICES, LLC; CONESTOGA INTERNATIONAL, LLC; CONESTOGA TRUST SERVICES, LLC; L.L. BRADFORD AND COMPANY, LLC; PROVIDENT TRUST GROUP, LLC; STRATEGIX SOLUTIONS, LTD.; MICHAEL MCDERMOTT; and JAMES SETTLEMENT SERVICES, LLC,

Defendants.

///

///

-2-

## ORIGINAL COMPLAINT

Plaintiffs Adina Lawson, Allen Ford, William Doubek, Mary Kay Doubek, Edwin P. Carter and Mary R. Carter 1998 Revocable Living Trust ("Carter Trust"), Michi Sato, Philip Stark, Stark-Baumgartner Trust ("Stark Trust"), Thomas Durliat, Patrick Amoriello, Luis Martinez, Louann Spiegel, Jodie Baedeker, Eberle Family Trust ("Eberle Trust"), Benita Luke, Ren Bevell, Karen Miles, Gary Musacco, Rosalyn Musacco, Oliphant Family Charitable Remainder Trust 11-11-14 ("Oliphant Trust"), Stephen Ragsdale, Leslie Reed, Chet Reilly, William Spaak, Robert Spaak, Whale Planet Media Inc. Defined Benefit Plan ("Whaley"), Hallie Aldridge, Norman Christianson, Ellen Christianson, Margaret Cowens, John Dancaster, David Greenfield, Laurie Greenfield, Richard Guiry, Lynn Corwin-Hernandez, Keith Jaroslow, Lisa Jaroslow, Kenneth Lane, Deatra Lane, Jill McGovern, Garnett S. Williams Trust ("Williams Trust"), Lowell Orren, Jed Firebaugh, Karen Wiley, Barbara Carrillo, Linda MacTaggart, Dennis Blough, Carolyn Demery, Robert and Karen Zeitzer Trust ("Zeitzer Trust"), Gregory Weiss, Steven Blauvelt, Gay Sato, Turner Family Charitable Remainder Trust ("Turner Trust"), Turner Property Investments, LLC ("Turner LLC"), Economics and Politics Inc. Retirement 401K Plan ("Husing 401K"), James F. Trice Revocable Living Trust 1 and 2 ("Trice Trusts"), the Estate of Michael Hickey ("Hickey Estate"), Charles Anderson, John Anker, Kathy Anker, David Kenney, Barbara Ogilvie, Karen Hunt, Larry Lycett, Helga Baker, James Slater, Michael C. Jackson, Ingrid Jackson, Roger Macleod, Deborah Kirby, Brian Craven, Michael Riccatone, Julie Riccatone, Black Hawk Funding, Inc. ("Black Hawk"), W. David Blackburn, Karlene Blackburn, Lawson Family Bypass Trust ("Lawson Trust"), Pamela Cherry, Janet Cheek, and Douglas Cheek bring this Complaint against Defendants Conestoga Settlement Services, LLC; Conestoga International, LLC; Conestoga Trust Services, LLC (collectively, "Conestoga"); Michael McDermott ("McDermott"); Provident Trust Group, LLC ("Provident"); L.L. Bradford and Company, LLC ("Bradford"); Strategix Solutions, Ltd. ("Strategix"); and James Settlement Services, LLC ("JSS").

## I. SUMMARY OF THE CASE

1.    This is a fraud case related to the sale of life settlement contracts marketed, sourced, and serviced by the Defendants. Plaintiffs are dozens of the over 1,000 investors that were

fraudulently induced to purchase Conestoga life settlement contracts on the false pretense that the investments were safe and secure retirement investments. The Defendants misrepresented key aspects of the investments and failed to disclose the magnitude, severity, and likelihood of the associated risks. Defendants also failed to disclose that several of them had been tainted by prior criminal and civil actions related to similar fraudulent schemes involving the sale of life settlement contracts. As a result of these and other misrepresentations and omissions, Plaintiffs have been harmed and continue to be harmed, and many have lost or imminently may lose their life savings.

2.      The fraud basically worked like this: Defendants offered retirees the opportunity to invest in a suite of life insurance contracts for individuals that they claimed had short life expectancies. Investors were told that a portion of their purchase money would be used to pay premiums due on the policies for the life expectancy of the insured person, plus an additional period of at least a year. The integrity of the investments would be protected by a system of "checks and balances" involving purportedly "independent" entities including Provident as escrow agent and Bradford as escrow auditor. Due to this structure and the inevitability of death, the investments were sold as low-risk retirement investments that would "always win."

3.      In reality, the Conestoga life settlement investments were very risky. The life expectancies were grossly inaccurate, the product of a manipulated process designed to lower the estimates far below what sound actuarial science supported. The escrow accounts were underfunded, and investors incurred additional premiums earlier than represented. The amount of the premiums exceeded the estimated annual premium costs quoted to investors, as Defendants knew would occur due to rising premium costs. And the purportedly independent entities that were entrusted to protect investors turned out to have numerous undisclosed conflicts of interest. As a result of this fraud, none of the 1,000-plus Conestoga investors has made a profit (or even made back their principal), and many have lost (or are at imminent risk of losing) much of the life savings they were counting on for retirement. Meanwhile, the Defendants have profited through excessive and undisclosed commissions and fees, premiums on their own shares subsidized by investors, and turnover of "forfeited" policies.

4.      Defendant Michael McDermott is the individual who founded the Conestoga entities and devised the scheme to acquire life insurance policies for non-party individuals and then to market and sell fractional interests in those policies to retirees and near-retirees. McDermott had earlier been one of the top sales agents in two disgraced life settlement companies, Life Partners and Retirement Value, the latter of which led to his criminal indictment in Texas on four felony counts, including fraud, theft, and money laundering. To execute his plan, McDermott formed a labyrinth of Conestoga entities that he used to acquire and sell fractional interests in the life settlement contracts to investors.

5.      McDermott also formed alliances with several other companies, including Provident, Bradford, and JSS, which were integral to the scheme. Provident purported to be the "escrow agent" for investors, while simultaneously managing Conestoga's "back office," overseeing Conestoga's network of sales representatives, and serving as the IRA custodian for many investors. Bradford, a disreputable accounting firm whose principals have since been indicted on multiple fraud counts, was to serve as the independent auditor for the escrow accounts, despite its undisclosed equity-sharing relationship with the purported escrow agent, Provident. JSS sourced all the policies in Conestoga's portfolio and provided all the premium and life expectancy information; investors were never informed that JSS had previously been tagged for fraud for providing similar false information in the Retirement Value scam.

6.      Each investor that purchased Conestoga life settlements signed a document called the Policy Selection Sheet ("PSS"). The PSS showed a grid with a separate line item for each policy that the investor was purchasing. The PSS stated critical information about the policies, including the investment amount, life expectancy, premium reserve period, payout amount, and estimated annual premium cost for each policy. These were key data points that materially affected the apparent value and risks of the investments. Investors relied on this information in deciding whether to purchase interests in Conestoga life settlements. McDermott and Conestoga created the PSS, Provident (and later Strategix) maintained the PSS and prepared it for each new investor, and JSS provided the life expectancy and premium data stated on it.

7.      As presented in the PSS, the investments appeared to be safe and low risk, as Conestoga claimed in marketing. But the truth was much different. The life expectancy, premium reserve, estimated annual premium, and payout information on the PSS were false and misleading. Less than ten of about 60 policies in Conestoga's portfolio matured timely, and even those few that paid out oftentimes paid less than represented on the PSS. Even worse, for the majority of the policies, investors have been demanded to pay annual premiums far in excess of the amount stated on the PSS, and in many cases much earlier than the PSS indicated premiums might be due, in order to avoid forfeiting their investment for no value. Many investors, most of whom are elderly retirees living on fixed incomes, are unable to pay these costs, and therefore have either forfeited large portions of their principal investments and savings or been forced to take drastic measures such as continuing to work through retirement or sell their homes to pay the costs. Any "forfeited" investments conveniently revert back to Conestoga.

8.      In addition to the PSS falsehoods, the Defendants failed to disclose to investors that (1) the life expectancies were manipulated to appear shorter (and therefore more attractive from an investment standpoint) than they actually were; (2) the company that sourced the policies and provided all the data about them, JSS, had previously been indicted for fraud in the sale of life settlements for falsifying life expectancy and premium data; (3) McDermott had been a key player and indicted for his role in a similar life settlement scam; (4) Conestoga was sanctioned by multiple state authorities for securities violations, including false and misleading statements, failure to properly register, and excessive commissions; (5) several defendants, including McDermott and the principals at Bradford and JSS, have been indicted on multiple felony counts, including fraud charges; (6) Provident and Bradford had undisclosed conflicts of interest; (7) the fees and commissions paid on the investments exceeded the disclosed amounts and were paid to persons other than the investor's individual sales agent.

9.      As a result of this fraud, Plaintiffs have been harmed, and many continue to be harmed through ongoing demands to pay excessive, unexpected premiums. In this action, on behalf of themselves and the class of other Conestoga investors, Plaintiffs seek injunctive relief to limit future harm (including an accounting and the appointment of a receiver to assume control of the

Conestoga portfolio), monetary relief for damages incurred, disgorgement of Defendants' ill-gotten gains, and other equitable relief.

## II.  THE PARTIES

10.    Plaintiff Adina Lawson is an individual who resides in Palm Desert, California. She can be contacted through the undersigned attorneys.

11.    Plaintiff Allen Ford is an individual who resides in Pompano Beach, Florida. He can be contacted through the undersigned attorneys.

12.    Plaintiff Bill Doubek is an individual who resides in Ventura, California. He can be contacted through the undersigned attorneys.

13.    Plaintiff Mary Kay Doubek is an individual who resides in Ventura, California. She can be contacted through the undersigned attorneys.

14.    Plaintiff Carter Trust is a trust represented by its trustees, Ed Carter and Mary Carter. Carter Trust can be contacted through the undersigned attorneys.

15.    Plaintiff Michi Sato is an individual who resides in Bend, Oregon. She can be contacted through the undersigned attorneys.

16.    Plaintiff Philip Stark is an individual who resides in Denver, Colorado. He can be contacted through the undersigned attorneys.

17.    Plaintiff Stark-Baumgartner Trust ("Stark Trust") is a trust represented by its trustees, Philip Stark and Christine Baumgartner. Stark Trust can be contacted through the undersigned attorneys.

18.    Plaintiff Thomas Durliat is an individual who resides in Pittsboro, North Carolina. He can be contacted through the undersigned attorneys.

19.    Plaintiff Patrick Amoriello is an individual who resides in Coral Springs, Florida. He can be contacted through the undersigned attorneys.

20.    Plaintiff Luis Martinez is an individual who resides in Homestead, Florida. He can be contacted through the undersigned attorneys.

21.    Plaintiff Louann Spiegel is an individual who resides in Menifee, California. She can be contacted through the undersigned attorneys.

22.     Plaintiff Jodie Baedeker is an individual who resides in Reno, Nevada. She can be contacted through the undersigned attorneys.

23.     Plaintiff Eberle Trust is a trust represented by its trustee, Joe Eberle. Eberle Trust can be contacted through the undersigned attorneys.

24.     Plaintiff Benita Luke is an individual who resides in Tahoe City, California. She can be contacted through the undersigned attorneys.

25.     Plaintiff Ren Bevell is an individual who resides in Las Vegas, Nevada. He can be contacted through the undersigned attorneys.

26.     Plaintiff Karen Miles is an individual who resides in Palm Desert, California. She can be contacted through the undersigned attorneys.

27.     Plaintiff Gary Musacco is an individual who resides in Rancho Mirage, California. He can be contacted through the undersigned attorneys.

28.     Plaintiff Rosalyn Musacco is an individual who resides in Rancho Mirage, California.  She can be contacted through the undersigned attorneys.

29.     Plaintiff Oliphant Trust is a trust represented by its trustee, Richard Oliphant. Oliphant Trust can be contacted through the undersigned attorneys.

30.     Plaintiff Stephen Ragsdale is an individual who resides in Wesley Chapel, Florida. He can be contacted through the undersigned attorneys.

31.     Plaintiff Leslie Reed is an individual who resides in Kingsburg, California. She can be contacted through the undersigned attorneys.

32.     Plaintiff Chet Reilly is an individual who resides in Arroyo Grande, California. He can be contacted through the undersigned attorneys.

33.     Plaintiff William Spaak is an individual who resides in Tiller, Oregon. He can be contacted through the undersigned attorneys.

34.     Plaintiff Robert Spaak is an individual who resides in Rancho Mirage, California. He can be contacted through the undersigned attorneys.

35.     Plaintiff Whaley is a pension account represented by its trustee, Marc Whaley. Whaley can be contacted through the undersigned attorneys.

36.     Plaintiff Hallie Aldridge is an individual who resides in Fair Oaks, California. She can be contacted through the undersigned attorneys.

37.     Plaintiff Norman Christianson is an individual who resides in Colorado Springs, Colorado. He can be contacted through the undersigned attorneys.

38.     Plaintiff Ellen Christianson is an individual who resides in Colorado Springs, Colorado. She can be contacted through the undersigned attorneys.

39.     Plaintiff Margaret Cowens is an individual who resides in Eugene, Oregon. She can be contacted through the undersigned attorneys.

40.     Plaintiff John "Rich" Dancaster is an individual who resides in Green Cove Springs, Florida. He can be contacted through the undersigned attorneys.

41.     Plaintiff David Greenfield is an individual who resides in Waupun, Wisconsin. He can be contacted through the undersigned attorneys.

42.     Plaintiff Laurie Greenfield is an individual who resides in Waupun, Wisconsin. She can be contacted through the undersigned attorneys.

43.     Plaintiff Richard Guiry is an individual who resides in Euless, Texas. He can be contacted through the undersigned attorneys.

44.     Plaintiff Lynn Corwin-Hernandez is an individual who resides in Rancho Mirage, California. He can be contacted through the undersigned attorneys.

45.     Plaintiff Keith Jaroslow is an individual who resides in Grants Pass, Oregon. He can be contacted through the undersigned attorneys.

46.     Plaintiff Lisa Jaroslow is an individual who resides in Grants Pass, Oregon. She can be contacted through the undersigned attorneys.

47.     Plaintiff Kenneth (Ken) Lane is an individual who resides in LaPine, Oregon. He can be contacted through the undersigned attorneys.

48.     Plaintiff Deatra (Dee) Lane is an individual who resides in LaPine, Oregon. She can be contacted through the undersigned attorneys.

49.     Plaintiff Jill McGovern is an individual who resides in Grass Valley, California. She can be contacted through the undersigned attorneys.

50. Plaintiff Williams Trust is an individual represented by its trustee, Garnett Williams. Williams Trust can be contacted through the undersigned attorneys.

51. Plaintiff Lowell Orren is an individual who resides in Pasadena, California. He can be contacted through the undersigned attorneys.

52. Plaintiff Jed Firebaugh is an individual who resides in Everett, Washington. She can be contacted through the undersigned attorneys.

53. Plaintiff Karen Wiley is an individual who resides in Irving, Texas. She can be contacted through the undersigned attorneys.

54. Plaintiff Barbara Carrillo is an individual who resides in Las Vegas, Nevada. She can be contacted through the undersigned attorneys.

55. Plaintiff Linda MacTaggart is an individual who resides in Orlando Park, Illinois. She can be contacted through the undersigned attorneys.

56. Plaintiff Dennis Blough is an individual who resides in Laguna Hills, California. He can be contacted through the undersigned attorneys.

57. Plaintiff Carolyn Demery is an individual who resides in Tempe, Arizona. She can be contacted through the undersigned attorneys.

58. Plaintiff Zeitzer Trust is a trust represented by its trustee, Robert Zeitzer. Zeitzer Trust can be contacted through the undersigned attorneys.

59. Plaintiff Gregory Weiss is an individual who resides in White Rock, New Mexico. He can be contacted through the undersigned attorneys.

60. Plaintiff Steven Blauvelt is an individual who resides in Bend, Oregon. He can be contacted through the undersigned attorneys.

61. Plaintiff Gay Sato is an individual who resides in Bend, Oregon. She can be contacted through the undersigned attorneys.

62. Plaintiff Turner Trust is a trust represented by its trustee, Karen Turner. Turner Trust can be contacted through the undersigned attorneys.

63. Turner LLC is a Wyoming limited liability company. Turner LLC can be contacted through the undersigned attorneys

64.     Plaintiff Economics and Politics Inc. Retirement 401K Plan ("Husing 401K") is a retirement account belonging to John and Debra Husing, who reside in Redlands, California. Husing 401K can be contacted through the undersigned attorneys.

65.     Plaintiff James F. Trice Revocable Living Trust 1 and 2 ("Trice Trusts") are trusts represented by their trustee, Laura McCullar. Trice Trusts can be contacted through the undersigned attorneys.

66.     Plaintiff Estate of Michael Hickey ("Hickey Estate") is the estate of Dr. Michael Hickey, who was a resident of Illinois prior to his death in April 2020. His widow, Ann Hickey, has been appointed by an Illinois probate court as the independent executrix of the Hickey Estate. The Hickey Estate can be contacted through the undersigned attorneys.

67.     Plaintiff Charles Anderson is an individual who resides in Marengo, Wisconsin. He can be contacted through the undersigned attorneys.

68.     Plaintiff John Anker is an individual who resides in Peoria, Arizona. He can be contacted through the undersigned attorneys.

69.     Plaintiff Kathy Anker is an individual who resides in Peoria, Arizona. She can be contacted through the undersigned attorneys.

70.     Plaintiff David Kenney is an individual who resides in New Braunfels, Texas.  He can be contacted through the undersigned attorneys.

71.     Plaintiff Barbara Ogilvie is an individual who resides in Frankfort, Illinois. She can be contacted through the undersigned attorneys.

72.     Plaintiff Karen Hunt is an individual who resides in Rancho Mirage, California. She can be contacted through the undersigned attorneys.

73.     Plaintiff Larry Lycett is an individual who resides in Lincoln, California. He can be contracted through the undersigned attorneys.

74.     Plaintiff Helga Baker is an individual who resides in Yuma, Arizona. She can be contacted through the undersigned attorneys.

75.     Plaintiff James Slater is an individual who resides in Thompsons Station, Tennessee. He can be contacted through the undersigned attorneys.

76.    Plaintiff Michael C. Jackson is an individual who resides in Cocoa, Florida. He can be contacted through the undersigned attorneys.

77.    Plaintiff Ingrid Jackson is an individual who resides in Cocoa, Florida. She can be contacted through the undersigned attorneys.

78.    Plaintiff Roger Macleod is an individual who resides in Colleyville, Texas. He can be contacted through the undersigned attorneys.

79.    Plaintiff Deborah Kirby is an individual who resides in Heath, Texas. She can be contacted through the undersigned attorneys.

80.    Plaintiff Brian Craven is an individual who resides in Woods Cross, Utah. He can be contacted through the undersigned attorneys.

81.    Plaintiff Michael Riccatone is an individual who resides in Grants Pass, Oregon. He can be contacted through the undersigned attorneys.

82.    Plaintiff Julie Riccatone is an individual who resides in Arvada, Colorado. She can be contacted through the undersigned attorneys.

83.    Plaintiff Black Hawk is a corporation organized under the laws of the State of Idaho with principal place of business in California. It can be contacted through the undersigned attorneys.

84.    Plaintiff W. David Blackburn is an individual who resides in Jacksonville, Florida. He can be contacted through the undersigned attorneys.

85.    Plaintiff Karlene Blackburn is an individual who resides in Jacksonville, Florida. She can be contacted through the undersigned attorneys.

86.    Plaintiff Lawson Trust is a trust represented by its trustee, Cecily Lawson. Lawson Trust can be contacted through the undersigned attorneys.

87.    Plaintiff Pamela Cherry is an individual who resides in Nashville, Tennessee. She can be contacted through the undersigned attorneys.

88.    Plaintiff Janet Cheek is an individual who resides in New Bern, North Carolina. She can be contacted through the undersigned attorneys.

89.     Plaintiff Douglas Cheek is an individual who resides in New Bern, North Carolina. He can be contacted through the undersigned attorneys.

90.     Defendant Conestoga Settlement Services, LLC is a limited liability company organized under the laws of Delaware. It may be served with process through its manager, Michael McDermott, at 644 Avenue Fernandez Juncos, Suite 301, San Juan, Puerto Rico 00907.

91.     Defendant Conestoga International, LLC is a limited liability company organized under the laws of Puerto Rico. It may be served with process at its principal business address at 644 Avenue Fernandez Juncos, Suite 301, San Juan, Puerto Rico 00907.

92.     Defendant Conestoga Trust Services, LLC is a limited liability company believed to be organized under the laws of Delaware. It may be served with process by and through its trustee, De Leon Washburn & Ward, P.C., at 901 S. Mopac Expressway, Barton Oaks Plaza, Building 5, Suite 230, Austin, Texas 78746.

93.     Defendant L.L. Bradford and Company, LLC ("Bradford") is a limited liability company believed to be organized under the laws of Nevada. Bradford may be served with process at its place of business at 8880 W. Sunset Road, Suite 190, Las Vegas, Nevada 89148. Bradford is the registered agent for itself with its seat at the same address.

94.     Defendant Provident Trust Group, LLC ("Provident") is a Nevada limited liability company. Provident may be served with process at its principal place of business at 8880 W. Sunset Road, Suite 250, Las Vegas, Nevada 89148.

95.     Defendant Strategix Solutions, Ltd. ("Strategix") is a Nevada limited liability company with its principal place of business in Nevada. Strategix may be served with process through its registered agent, Dustin Lewis, at its principal place of business at 8880 W. Sunset Road, Suite 190, Las Vegas, Nevada 89148.

96.     Defendant Michael McDermott ("McDermott") is the founder and manager of Conestoga, including Conestoga Settlement Services, LLC and Conestoga International, LLC. McDermott may be served with process at his principal place of business at 644 Avenue Fernandez Juncos, Suite 301, San Juan, Puerto Rico 00907.

97.    Defendant James Settlement Services, LLC ("JSS") is a Delaware limited liability company, with its principal place of business in Nevada. JSS may be served with process through its registered agent, Laughlin Associates, Inc., at 9210 Double Diamond Parkway, Reno, Nevada 89521.

### III.  JURISDICTION AND VENUE

98.    This Court has original subject-matter jurisdiction under the Class Action Fairness Act because this is a class action where at least one class member is a resident of a different State from at least one Defendant and the amount in controversy exceeds $5 million.

99.    This Court also has original subject-matter jurisdiction over the federal securities claims pursuant to 28 U.S.C. § 1331 because those claims arise under federal law.

100.    The Court also has supplemental jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims over which this Court has original jurisdiction as to form part of the same case or controversy.

101.    The Court has personal jurisdiction over all of the Defendants because the claims asserted in this action arise out of and are connected to the Defendants' activities within and specifically directed towards the State of Nevada. In particular, many of the allegations relate to marketing and servicing the Conestoga life settlement investments that occurred in Nevada, and several Plaintiffs who purchased the investments are residents of Nevada.

102.    In addition, this Court has personal jurisdiction over Provident, Strategix, Bradford, and JSS because those Defendants are residents of Nevada and therefore subject to general jurisdiction in this State.

103.    Venue is proper in this District because (a) a substantial portion of the events or omissions giving rise to the claims occurred in this District, and (b) several Defendants—including Provident, Strategix, Bradford, and JSS—are Nevada residents.

///

///

///

///

-14-

## IV. GENERAL FACTUAL ALLEGATIONS

### A. Introduction to the Business of Life Settlement Contracts

104. A life settlement contract is a transaction in which an insured person—typically a person who is elderly or terminally ill—sells his or her life insurance policy to a third party for less than the face value of the policy (*i.e.,* the death benefits paid upon maturity).

105. Once the life insurance policy has been acquired, the purchaser becomes the new beneficiary and has the right to collect the death benefits payable under the policy at maturity as long as the policy remains in force. The purchaser may also sell the policy to another investor or, alternatively, sell fractional interests in the policy to multiple investors.

106. As explained below, Conestoga is involved in the business of selling fractional investments in life settlement contracts. It acquired the life settlement contracts from JSS and then held the contracts in the Conestoga Trust. Conestoga then sold fractional interests in the contracts to individual investors. Investors who purchased the fractional interests from Conestoga became beneficiaries of the Conestoga Trust.

107. Provident, Strategix, and Bradford have each been involved in marketing and managing Conestoga's business in regards to the sale of life settlements to investors.

### B. McDermott, JSS, and Provident's Prior Related Life Settlement Schemes

108. Years before Conestoga was founded, McDermott, JSS, and Provident were involved in other life settlement companies that turned out to be scams.

109. The first of these prior life settlement scams was a company called Life Partners. Based in Fort Worth, Texas, Life Partners was one of the largest life settlement companies in history with total business volume of over $3.2 billion in face value of traded policies and tens of thousands of investors worldwide.

110. McDermott was one of the top-performing sales agents at Life Partners. He managed a large team of sales agents that sold Life Partners investments to many investors.

///

///

///

111.    Provident[1] provided IRA custodial services for Life Partners. Many investors who chose to invest in Life Partners through their retirement accounts did so by opening an account at Provident. Provident then held the Life Partners assets on behalf of investors.

112.    Ultimately, the Life Partners scam collapsed. One federal appellate court described it as a "Ponzi-like scheme." The bankruptcy trustee managing Life Partners' bankruptcy called it "one of the largest and longest-standing fraud schemes" in Texas history.

113.    According to the *Wall Street Journal*, 95% of the insured people on the policies sold by Life Partners were still living after the life-expectancy period stated by Life Partners. The company was also accused of hiding "massive fees and commissions" from investors. In total, Life Partners investors—mostly elderly retirees—lost hundreds of millions of dollars.

114.    In or around 2008, McDermott quit working for Life Partners to become one of six "master licensees" at a new life settlements company called Retirement Value.

115.    McDermott brought a large team of sales agents from Life Partners to Retirement Value. He quickly became the top-performing sales agent in the Retirement Value organization. McDermott's sales team was responsible for about half of all Retirement Value sales.

116.    Provident was also involved in Retirement Value. Provident partnered with Retirement Value to serve as the IRA custodian for Retirement Value investors that chose to invest retirement funds with Retirement Value, just as it had done with Life Partners. Thanks to Provident's involvement, Retirement Value could target retirees' hard-earned savings.

117.    Retirement Value's business was to sell notes to investors, which were supposed to pay a substantial return when certain life settlement policies held in trust matured. Investors were told that a portion of their funds would be placed into segregated escrow accounts and that the escrow funds would be used to service the premiums on the life insurance policies.

118.    Retirement Value investors were also told that the funds in escrow provided a reserve that would cover premiums for a certain period, which was represented to be the life expectancy of the insured persons plus an additional period of at least a year.

---

[1] Provident previously did business under the name Trust Company of the Pacific.

119. All or nearly all of the life insurance policies sold by Retirement Value were sourced by JSS, which was run by Ronald James and his son Donald James. JSS also provided all of the life expectancy, premium cost, and premium reserve information for the policies.

120. In or around 2010, the State of Texas shut down Retirement Value. A Texas court later appointed a receiver to take over management of the life insurance assets and trust.

121. The State also brought civil claims against several entities associated with Retirement Value, including McDermott, JSS, Ronald James and Donald James, for violations of the Texas Securities Act and Texas Deceptive Trade Practices Act.

122. In 2015, McDermott, Ronald James, and Donald James were each indicted for their roles in Retirement Value on multiple felony counts for securities fraud, theft, money laundering, and organized criminal activity. A report by the Retirement Value receiver called McDermott, Ronald James, and Donald James the "principals of Retirement Value."

123. Among other things, the State alleged that these Defendants had misrepresented key facts about the Retirement Value investments, including in regards to the life expectancies, premium reserves, and escrow accounts.

124. McDermott agreed to settle civil claims against him related to Retirement Value for $750,000. JSS agreed to settle claims against it for over $1 million.

125. In total, the Retirement Value scam defrauded about 1,100 investors—most of whom were elderly retirees—out of over $70 million.

126. Conestoga investors were never told about the allegations against McDermott, JSS, and Provident related to Retirement Value, which would have been material to investors.

**C. McDermott, JSS, and Provident Partner Again to Form Conestoga**

127. After Retirement Value ended, McDermott decided to form a new life settlements company similar to Retirement Value. McDermott told another top sales agent from Retirement Value, Mike Woods, that he "wanted to found another life settlements company similar to Retirement Value." McDermott called the new company Conestoga.

///

///

-17-

128. With the help of a Texas lawyer, McDermott formed various Conestoga entities to play different roles in marketing and servicing the investments. McDermott was named as the founder and sole manager of each of the Conestoga entities.

129. Woods said in a sworn affidavit that Conestoga and Retirement Value were "similar … in that investors were told that the purchase money for their investments would be put into escrow accounts, and the money in those accounts would be used to pay premiums on the policies for the life expectancy of the insured person plus an additional period, which was at least one year and often more." In addition, "[l]ike Retirement Value and Life Partners, Conestoga was set up as a MLM [multilevel marketing company]."

130. In a sworn declaration filed by McDermott and Conestoga in court earlier this year, McDermott admitted that he was "one of the principal people involved in the establishment of the Conestoga Trust" and that he is "personally familiar with how Conestoga Trust conducted business and sold life settlements at all times it was involved with selling same."

131. Conestoga International, LLC is described in the Private Placement Memorandum ("PPM") related to the Conestoga life settlement investments as the entity that marketed, offered, and sold fractional interests in the life settlement contracts to investors. The PPM makes clear that the representations and promises made in the PPM were representations and promises made by Conestoga International, LLC.

132. Conestoga Trust Services, LLC was formed to be the trustee of Conestoga Settlement Trust. According to the PPM, Conestoga Settlement Trust (now Conestoga Trust) owns the underlying life insurance policies that McDermott and Conestoga International LLC marketed and sold to investors in the form of fractional interests in life settlement contracts.

133. As the trustee of the trust that owns the life insurance policies, Conestoga Trust Services, LLC owes fiduciary duties to trust beneficiaries. It also knowingly permitted and encouraged McDermott and Conestoga International LLC (and their agents) to act as its agents in marketing, offering, and selling fractional interests in the insurance policies to investors.

///

///

134.    Conestoga Settlement Services, LLC was formed to be the organizing entity and initial trustor for the Conestoga Settlement Trust. According to the PPM, Conestoga Settlement Services, LLC was the trustor for all the investments sold for the first two years of the scheme.

135.    As with Retirement Value, Conestoga acquired all of the life settlement policies that it sold to investors from JSS. Conestoga also got all of the premium and escrow information about the policies from JSS, and Conestoga recklessly passed this information along to investors without taking any steps to verify its accuracy and reliability, despite the fact that Conestoga and its founder McDermott knew about JSS's prior fraudulent history. Conestoga investors were never informed that JSS had been accused of fraud, theft, and other crimes in relation to providing the same kind of policies and information to Retirement Value investors.

136.    As with Retirement Value, Conestoga also partnered from its earliest days with Provident. As discussed below, among other roles, Provident agreed to serve as the "escrow agent" for participants in the Conestoga investments and to provide the "back office" administrative services to Conestoga, including handling all paperwork associated with the investments, maintaining and preparing the policy selection sheets for investors, and being responsible for paying all commissions to sales representatives and "upline" agents.

**D.  Defendants Misrepresent Key Features of the Conestoga Investments**

137.    The Conestoga life settlements were marketed almost exclusively to older investors as "safe" investments that would "always win." According to a Conestoga marketing brochure, unlike market-based investments such as stocks or mutual funds, which could "win, lose, or draw," the investments would either "win early, win on time, or win later."

138.    Conestoga specifically targeted older investors who were at or near retirement age. By casting the investments as a low-risk, always-win alternative to traditional investments, Conestoga made the investments attractive for older investors who were concerned about protecting their retirement savings against the risk of loss. In reality, however, the Conestoga investments were much more risky than traditional investments.

139.    One of the key pieces of information that Conestoga provided all investors was the so-called Policy Selection Sheet ("PSS"). The PSS was a chart that showed key information about

the policies that the investor was considering investing in, including the policy code, amount invested, purported life expectancy, premium reserve period, payout at maturity, and estimated annual premium cost. Investors relied on this information in deciding whether to invest.

140. McDermott admitted in a sworn declaration filed in federal court that, "[a]t all times and for all sales, each investor who invested in life settlements through Conestoga … would have been provided and signed a Policy Selection Sheet."

141. Below is an example of the PSS that was provided to investors (this particular example relates to Plaintiff Kenneth Lane's investments):

**EXHIBIT A**  **CONESTOGA INTERNATIONAL, LLC**   **POLICY SELECTION SHEET**

PARTICIPANT NAME: _____  DATE: 7/10/13

JOINT PARTICIPANT NAME: _____  DATE: _____

Participant(s) desires to purchase and become fractional owner(s) of certain life insurance policies' proceeds and elect to participate using $141,993.00 US Dollars for the policies and amounts selected below.

| Insured Policy Code | Face Amount | Insurance Companies | Current Insured Age & Gender | Original LE in months | Original Premium Reserve (in months) | Client Funds Placed | Payout At Maturity | Estimated Annual Premium | Funds Designated For Premiums | Estimated Age When Premium Calls Begin |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. RR052413JH | $1,800,000 | John Hancock | 84 F | 51 | 63 | $15,777 | $23,153 | $1,145 | $6,010 | 90 |
| 2. SR053110AE | $10,000,000 | AXA Equitable | 81 M | 40.5 | 76.5 | $15,777 | $23,232 | $679 | $4,330 | 84 |
| 3. FG 0413LB | $1,000,000 | Lincoln Benefit | 85 F | 48 | 60 | $15,777 | $22,719 | $884 | $4,419 | 90 |
| 4. RJ0613ML | $1,500,000 | Met Life | 85 F | 48.5 | 60.5 | $15,777 | $22,791 | $1,048 | $5,286 | 90 |
| 5. BP0413AE | $1,500,000 | AXA Equitable | 80 M | 55 | 67 | $15,777 | $23,731 | $911 | $5,088 | 86 |
| 6. SB0612JH | $10,000,000 | John Hancock | 78 F | 61 | 91 | $15,777 | $27,005 | $729 | $5,526 | 85 |
| 7. CE.0413.SL | $2,000,000 | Sun Life | 79 M | 65 | 77 | $15,777 | $25,177 | $424 | $2,719 | 86 |
| 8. DL0413MO | $1,000,000 | Mutual of Omaha | 83 F | 66 | 78 | $15,777 | $25,322 | $1,099 | $7,145 | 90 |
| 9. FD0413.JH | $2,500,000 | John Hancock | 80 M | 72 | 84 | $15,777 | $26,190 | $822 | $5,754 | 86 |
| | $31,300,000 | * As of 05/13 | | | | $141,993 | $219,320 | $7,741 | $46,276 | |

The policies above may no longer be available by the time your funds can be placed into them. If any of the policies selected are withdrawn or are filled, Participant authorizes Conestoga to distribute that portion of Participant's funds that was allocated to the now unavailable policies to any newly - available policies, or if there are no new policies available, than among the other policies previously chosen by the Participant on an equal, pro-rata basis.

_____ I elect to place my total participation in EQUAL PORTIONS among all policies available.
initial

_____ I elect to place my total purchase in SELECTED AMOUNTS per the Exhibit A selections above, or in policies of comparable value.
initial

Participant Signature: (SIGN HERE) _____

Joint Participant Signature: (SIGN HERE) _____

142. Almost every investor received a PSS substantially similar to this, with only minor variations to the form of the document made over the course of Conestoga's history.

143. The first column "Insured Policy Code" provides a code referencing each underlying insurance policy.

144. The fourth column states the purported age and gender of the insured person on the policy as of the date specified: May 2013.

145. Investors were not informed before purchase that the policy code embedded critical information about Conestoga's acquisition of the policies, and that the life expectancy and premium reserve periods related to this encoded date rather than the date of investment or the date specified for the age of the insured person. The difference in these dates had the effect of making the remaining reserve period appear longer.

146. In an October 2016 email, McDermott stated that, as a result of this sleight of hand in the relevant dates, there was "confusion in the amount of time that participants [*i.e.*, investors] expected to pass before receiving premium calls."

147. As shown in this example, the PSS claimed that all of the insured persons were around 80 years old. Conestoga led investors to believe that the insured persons were all elderly, in poor or declining health, and likely to pass away within a few years.

148. The fifth column states the life expectancy in months of the underlying insured persons, and the sixth column states the purported "premium reserve" in months. As the example depicts, the life expectancies for the insured persons were said to be only a few years, usually less than five years. For all policies that Conestoga sold, the PSS represented that the premium reserve period was at least twelve (12) months longer than the life expectancy.

149. Thus, the PSS conveys that the policies were likely to mature within a few years and that investors would not have to pay any premiums until at least a year—and often more than a year—after the life expectancy period. This misleads a reasonable person to believe that most of the policies would likely never incur additional premiums and that leftover escrow funds from early-maturing policies could be used to pay premiums on later-maturing policies, thus making it unlikely that investors would ever have to pay additional premiums out of pocket. But in reality, at the time of investment, it was actually highly likely that the majority of the policies *would* incur additional premiums. And predictably, in light of information now known about how the life expectancies and premium reserves were calculated (discussed below), the vast majority of the policies sold by Conestoga have incurred additional premiums.

150. The life expectancy and premium reserve stated on the PSS was provided by JSS, which had previously been accused of fraud for providing faulty life expectancy data. The

methodology that JSS used to compute the life expectancy was fundamentally flawed and designed to reduce the stated life expectancy below what sound actuarial science and objective mortality data would reasonably support.

151.    As it has turned out, less than ten of the 59 policies in Conestoga's portfolio have matured and paid a benefit within the life expectancy forecasted. Such low incidence of maturities is exceedingly unlikely, if the life expectancies had been honestly done.

152.    In addition, the majority of the policies in the Conestoga portfolio have incurred additional premiums months or years earlier than the PSS indicates. As a result, investors have been demanded to pay premiums that they did not expect and in amounts that far exceed what they were told was the estimated annual premium on the policies.

153.    The seventh and eighth columns indicate the amount of client funds placed and the investor's purported payout at maturity on each policy. In rare instances where a policy has matured and paid a benefit, the payout at maturity stated on the PSS has turned out to be substantially higher than the amount paid to investors in many cases.

154.    The ninth column states the "Estimated Annual Premium" in dollars. This gives the false and misleading impression that this number was a good faith, reasonable estimate of the annual premiums that investors might be required to pay if the insured person survived the premium reserve period. In fact, the premiums that have been charged to investors have greatly exceeded the amounts stated on the PSS.

155.    In a sworn declaration, McDermott admitted that "the amount listed as 'Estimated Annual Premium' was the average of an increasing amount," and that "[b]ecause it is an average, for the first couple of years of the premium reserve period, the estimate (provided by [JSS]) of what would need to be paid as premiums would have been *less than* the amount listed as 'Estimated Annual Premium'" and "towards the end of the Original Premium Reserve period, the estimate (provided by [JSS]) of what would need to be paid as premiums was *more than* the amount listed as the 'Estimated Annual Premium.'"

///

///

-22-

156.    Implicit in this statement is that the amount stated as the estimated annual premium on the PSS was significantly lower than the annual premiums that Conestoga knew investors would be required to pay after the purported reserve period elapsed.

157.    Investors were never informed, either in the PSS or elsewhere, that (a) the estimated annual premiums were provided by JSS, an entity with a prior history of providing false life expectancy and premium information in connection with life settlements; (b) that the Estimated Annual Premium reflected the average of an "increasing amount"; and (c) that the actual expected premium amount at the end of the premium reserve, when investors would have to pay, would be much "*more than* the amount listed as the 'Estimated Annual Premium.'"

158.    As discussed below, Provident was involved in preparing the PSS provided to investors. Provident routinely prepared a version of the PSS for new investors.

159.    In addition, Provident also sent correspondence to investors on its own letterhead that made the same misrepresentations as the PSS. Below is an example of the letter Provident sent investors (this one also relates to Plaintiff Kenneth Lane's investment):

**PROVIDENT** Trust GROUP

COPY

September 3, 2013

KENNETH LANE
16513 S Lapine Drive
Lapine, OR 97739

Re:    Provident Group Account # **130700167**  KENNETH LANE TRADITIONAL IRA

Dear KENNETH LANE,

We are pleased to welcome you to Provident Trust Group ("PTG"). As Custodian for your Traditional IRA and Escrow Agent for Conestoga International, LLC ("CSS"), we have received and deposited funds per the Policy Selection sheet you submitted. As noted below, your total deposits have been allocated to the following CSS escrow accounts in the increments shown:

| Policy Code # | Face Amount | Insurance Companies | Age & Gender of Insured | Life Expectancy (Months) | Premiums In Escrow (Months) | Client Participation | Expected Payout At Maturity |
|---|---|---|---|---|---|---|---|
| 1. RR052413JH | $1,800,000 | John Hancock | 84F | 51 | 63 | 16,624.00 | 24,395.72 |
| 2. SR053110AE | $10,000,000 | AXA Equitable | 81 M | 40.5 | 76.5 | 16,624.00 | 24,478.84 |
| 3. FG 0413LB | $1,000,000 | Lincoln Benefit | 85F | 48 | 60 | 16,624.00 | 23,938.56 |
| 4. RJ0813ML | $1,500,000 | Met Life | 85F | 48.5 | 60.5 | 16,624.00 | 24,014.75 |
| 5. BP0413AE | $1,500,000 | AXA Equitable | 80M | 55 | 67 | 16,624.00 | - |
| 6. SB0612JH | $10,000,000 | John Hancock | 78F | 61 | 91 | 16,624.00 | 28,454.75 |
| 7. CE.0413.SL | $2,000,000 | Sun Life | 79M | 65 | 77 | 16,624.00 | 26,529.13 |
| 8. DL0413MO | $1,000,000 | Mutual of Omaha | 83 F | 66 | 78 | 16,624.00 | 26,681.52 |
| 9. FD0413.JH | $2,500,000 | John Hancock | 80 M | 72 | 84 | 16,624.00 | 27,595.84 |
| | $31,300,000 | * As of 05/13 | | | | $ 149,616.00 | $ 206,089.11 |

**NOTE:** Please remember that Exhibit A of your Life Insurance Policy Funding Agreement allows CSS to replace any unavailable policies with another life insurance policy on the life of an insured with a similar life expectancy to that of such withdrawn policy. If you would like to reject any of the policies listed above, you must notify Provident by fax at or e-mail within ten (10) business days of receiving this letter. You will then be allowed to choose an alternative existing policy. Enclosed is a copy of the policy selections currently available.

**Please Note:** If we do not receive a rejection notice within the required timeframe, all policy selections will become Final.

Contact Us:
Toll Free: (888) 855.9856
Fax: 702.253.7565
info@trustprovident.com

Please Send ALL Checks to:
Provident Trust Group Lockbox
P.O. Box 4330
Ontario, CA 91761

Corporate Headquarters:
8880 W. Sunset Road, Suite 250
Las Vegas, NV 89148
www.trustprovident.com

160.    This letter contains many of the same false and misleading representations and omissions about the life expectancy, premium reserve, and payout at maturity as the PSS. For example, it states the false and misleading life expectancy and premium reserve data, gives the misleading impression that this data relates to the same date as the age of the insured and/or the date of the document, and provides inaccurate payout information. It also fails to disclose that the life expectancy and premium data derived from JSS, despite Provident having been affiliated with Retirement Value and knowing about JSS's fraudulent history. It also fails to disclose that the premium costs would increase over time, despite Provident having access to the policy illustrations that forecast the increasing annual premium costs.

161.    This letter also identifies Provident as the "Custodian for your Traditional IRA and Escrow Agent for Conestoga International LLC." Years later, Provident denied in court filings that it ever served as the escrow agent. If that is true, this statement in the letter about Provident serving as the "Escrow Agent" was materially false and misleading.

162.    Notably, this letter states that the investor may "reject any of the policies listed above" by "notify[ing] Provident by fax at [sic] or email within ten (10) business days of receiving this letter." The letter also encloses "a copy of the policy selections currently available," referring to a master version of the PSS that Provident kept and maintained.

163.    Provident sent a substantially similar version of this letter to all investors who purchased their investments before approximately February 2016 when Provident handed over its "back office" duties for Conestoga to its affiliate, Strategix.

**E.  Conestoga Markets Life Settlements Through a Multilevel Marketing Structure**

164.    Conestoga sold fractional interests in the life settlements to investors through a multilevel marketing network of independent sales representatives. The fact that Conestoga utilized a multilevel marketing structure, and that all "upline" agents would be paid a commission on every investment sale, was never disclosed to investors.

165.    At the very top of the multilevel marketing period was McDermott himself. Below him were three "senior field advisors" or "master licensees": Frederick Rust, Michael Woods (who participated through an entity he founded called Dayspring Financial LLC), and for a shorter

-24-

period, Brian Cervenka. Woods and Rust had also each been sales leaders for Retirement Value. Rust also worked as a sales representative for Life Partners.

166.    Below the senior field advisors was a network of hundreds of sales representatives nationwide. Rust had about 300 different individuals in his organization who were recruited to market Conestoga life settlements. There were also at least 30 to 35 agents working in Dayspring's downline. It is unknown how many agents worked under Cervenka.

167.    Each sale to investors resulted in a sales commission being paid to the independent representative who made the sale, as well as to each agent in the representative's "upline." McDermott himself received a commission for individual sales in the amount of 4% of the purchase price. Investors were never informed that persons other than their own sales agent, including McDermott, received a commission out of their purchase money.

168.    Rust, Woods, and Cervenka were responsible for recruiting new independent sales agents. They specifically targeted insurance agents and financial advisors to be agents.

169.    Typically, a life insurance agent working for one of the senior field advisors would make the initial contact with new potential agents at an insurance or financial planning conference or similar event and would direct the potential agent to contact the senior field advisor. The agent working for the senior field advisor would tell the potential agent that they could earn commissions selling Conestoga life settlements to investors.

170.    When the prospective agent called, the senior field advisor would explain the basic details about the investment to them. The senior field advisor would then send the prospective agent some written marketing materials, including a sales brochure called the Fractional Life Settlement Portfolio and the PPM. New agents were instructed by the senior field advisors to consult these written marketing materials for information about the investments. These misrepresentations, in turn, filtered down to investors through the sales agents.

a.    **The Fractional Life Settlement Portfolio**

171.    One of the Conestoga written marketing materials was a brochure called the Fractional Life Settlement Portfolio. The Fractional Life Settlement Portfolio stated that it should be "preceded by or accompanied by, and read in conjunction with the Private Placement

Memorandum to fully understand the implications and risks of the offering of interests in life settlements to which [the Fractional Life Settlement Portfolio] relates."

172.    The Fractional Life Settlement Portfolio described the Conestoga life settlements as "safe," "simple," and "predictable," with "[n]o moving parts, except the passage of time, and the payment of premiums." This statement was false and misleading. The investments were highly risky and involved a variety of "moving parts" that were never disclosed, including the fact that annual premiums would increase well beyond the amounts stated in the PSS.

173.    The fact that the insurance companies could and would raise the premiums on the policies over time was reflected by the policy illustrations associated with each policy. Defendants had access to these illustrations, but investors and sales representatives did not. Investors were never informed that the illustrations forecasted sharply rising premiums.

174.    According to the Fractional Life Settlement Portfolio, the proposed investments in the life settlement contracts were "designed to offer one result," which was to "always win."

175.    The Fractional Life Settlement Portfolio proclaimed there were only three possible results from participating in a Conestoga life settlement: "Win Early," "Win On Time," or "Win Later." By contrast, the document criticized "traditional investments" such as stocks, bonds, and CDS, as being unpredictable and offering any of three possible results: "Win," "Lose," or "Draw." These statements were made to intentionally deceive investors into believing that they would necessarily earn profits ("win"), not lose money ("lose") or come out even ("draw"), by investing in the Conestoga life settlement contracts. This was false and misleading.

176.    The Fractional Life Settlement Portfolio also falsely represented that "[n]o Stranger Originated Life Insurance Policies (STOLI) are offered." In many states, STOLI policies are illegal and the insurance company will not pay death benefits on a STOLI policy. However, in fact, at least one of the policies that Conestoga sold to investors was a STOLI. For example, the only policy in investor Ken Lane's portfolio (see screenshots above) that has matured did not pay a benefit because it turned out to be an illegal STOLI policy.

177.    The Fractional Life Settlement Portfolio represented that "Conestoga escrows premiums for more than six years to more than eight years for the policies offered in its portfolio."

In reality, investors have been required to pay additional premiums within only a few years of investing (frequently before six years) to avoid lapsing their interests.

178.    The Fractional Life Settlement Portfolio represented that the companies partnering with Conestoga—including Provident and Bradford—were completely "independent of each other" and independent of McDermott and Conestoga. The Fractional Life Settlement Portfolio represented that the "use of independent entities, including an escrow agent [Provident], accounting firm [Bradford], custodial bank, and compliance law firm, ensures that checks and balances are built into the Conestoga model." These statements were false and misleading. In fact, these entities were not independent of each other, and they had conflicts of interest that were not properly disclosed to participants.

179.    For instance, Provident and Bradford (as well as Strategix) each share a principal place of business at the same office address in Nevada in a building owned by a Bradford affiliate called Stable Development controlled by Bradford's founder, Lance Bradford. As a term of Provident's office lease, it granted Stable Development an interest in Provident's profits. Lance Bradford refers to this arrangement as a "Shared Equity Model."

180.    These relationships between Provident and Bradford were never disclosed to investors, despite the fact that Bradford was purportedly serving as the neutral auditor to make sure that the escrow agent, Provident, handled the investors' escrowed funds properly.

181.    The Fractional Life Settlement Portfolio also provides a false and misleading estimate of the expected rate of return for participants. In a Frequently Asked Questions (FAQ) section, for example, the document addressed the question, "What annual rate of return should I expect?" The answer states, in part, as follows:

> Your hypothetical annual rate of return is determined by the duration between the purchase of the investment and when the investment pays off. For example, with a policy paying a 56% total fixed return, an investment of $100,000 in the policy will return $156,000 upon maturity. If that term is five years, your annual rate of return would, in effect, be 11.2%. If it's seven years, your return would be 8%. We acquire policies from insureds 75 years of age and older with chronic or degenerative health conditions.

182.    This answer makes it seem as if the only relevant variable is the passage of time, which is reinforced by other representations in the document. It assumes that participants will not

have to pay additional funds in order to see the underlying life insurance policies to maturity. It fails to disclose that the participants' annual rate of return will likely be substantially diminished (or even might produce a substantial loss or be forfeited) because the participants will likely be required to make significant out-of-pocket premium payments (in ever-increasing amounts) in the years before the policies mature to maintain the policies.

183.    This also represents that Conestoga had only acquired insurance policies from "insureds 75 years of age and older with chronic or degenerative health conditions," which was a false or misleading statement that further induced investors into investing because it created the impression that the life insurance policies would mature soon. The actual longevity of the insureds over the last several years shows this representation was not true.

**b.    The Private Placement Memorandum and Life Expectancy "Estimates"**

184.    Another important written marketing material was the PPM. Although the PPM changed slightly over time, the various versions of the PPM each contained substantially similar false and misleading statements and material omissions about the investments.

185.    Like the Fractional Life Settlement Portfolio, the PPM falsely represented that the "only variable is the date the policy matures, i.e., when the insured person dies." In fact, there were numerous other variables that were not properly disclosed.

186.    The PPM represented that the "most important factor in pricing fractional interests in policy benefits is the life expectancy of the insured person." Elsewhere, the PPM stated that the "primary factor" in calculating expected returns "is the date when the insured person dies and when the Participant is paid the applicable percentage of the death benefit."

187.    The PPM gave the false and misleading impression that participants were likely to be protected from future premium calls because the amounts held in escrow would be enough to cover the stated life expectancy of each insured, *plus* an additional cushion period. In truth, most of the Conestoga policies incurred additional premiums before the stated premium reserve period (*i.e.*, life expectancy plus cushion period) elapsed, as Defendants knew or recklessly ignored.

188.    Relatedly, the PPM stated: "If the insured person dies before the period of life expectancy, the Participant *will have funds remaining in escrow.*" (emphasis added). The PPM

continued: "No one can with certainty predict the date of death of the insured person. For that reason, Conestoga *requires that premiums for an additional amount of time beyond the estimated life expectancy of the insured person be placed into escrow*, to keep the policy in force." (emphasis added) These statements misled investors that the escrowed reserves would be sufficient to pay the costs of insurance throughout the stated premium reserve period. These statements also misled investors to believe that the investments were low risk because additional money had been set aside to cover premiums beyond the life expectancies on each policy.

189.    The PPM also misled investors regarding the life expectancies. The PPM represented that "[a]verage life expectancies are predicted by two licensed and registered independent life expectancy underwriting companies, or by a combination of an underwritten life expectancy and a life expectancy issued by the United States Social Security Administration." The PPM failed to disclose that these private companies had been engaged by JSS, which was accused of fraud for providing false life expectancy data for Retirement Value, and that the life expectancies by the private companies were substantially shorter than the life expectancies issued by the Social Security Administration (based on actual mortality data).

190.    McDermott's sworn declaration stated that, "[w]henever a policy was sold to Conestoga Trust by [JSS], the policy was added to a master spreadsheet maintained by [JSS] and provided to Conestoga Trust, which listed relevant data related to each policy." The declaration included an "image from one of the spreadsheets with the names of the insureds redacted" that JSS provided McDermott and Conestoga about the policies, as shown below in the exact form as it appeared in McDermott's declaration:

///
///
///
///
///
///
///

-29-



191.    Columns C-F in the image above show the life expectancy data provided by JSS from three private actuarial firms (column C—Convergence, column D—Focus, and column E—Clarity), as well as the Social Security Administration (column F). In all cases, the private estimates are significantly lower than the Social Security Administration estimates.

192.    Of the fourteen policies visible in the screenshot, the average Social Security Administration life expectancy is 79.68 months. The average private estimate on the eight policies for which Social Security Administration data is available is 48.58 months. The private estimates, on average, are more than 2.5 years shorter than the Social Security data.

193.    Despite the fact that the life expectancies were prepared in such a way as to understate the life expectancy, the PPM falsely and misleadingly represented that "Conestoga's life expectancy reports are conservative." In fact, the life expectancy estimates provided were not conservative at all compared to the objective Social Security data, as Conestoga knew.

194.    The "Blended LE +" column above apparently shows the purported premium reserve period for these policies. In all cases, even this period (which supposedly includes the

minimum 12-month cushion over and above the life expectancies) is shorter than the Social Security Administration data supports. The average reserve period on the same eight policies is 71.35 months. Thus, even the cushioned reserve period is, on average, more than seven months below the average of the Social Security data.

195.    Investors were never informed that the life expectancies stated in the PSS were substantially shorter than the life expectancies predicted by the Social Security mortality data, and that that the premium reserve period was also substantially shorter than the Social Security data supported. These would have been material facts to reasonable investors.

196.    Although the PPM warned that measuring life expectancy estimates are "inherently uncertain," it failed to disclose that its methodology was specifically intended to understate life expectancies by a significant margin. This had the effect of making the policies appear more valuable that they were because (a) the policies appeared likely to mature earlier and thus pay a benefit earlier, and (b) an earlier-maturing policy would incur fewer premiums.

197.    Due to the flawed and deceptive methodology used to calculate and understate the life expectancies, the vast majority of insured persons have outlived their stated life expectancies. In fact, less than ten of the 59 policies in Conestoga's portfolio matured within the stated life-expectancy period. As a statistical matter, it is extremely unlikely that so few policies would have matured within the stated life expectancies if the life expectancies had been done reasonably in accordance with sound actuarial practice.

198.    The PPM failed to make adequate disclosures regarding the magnitude, likelihood, and degree of the risks of the life settlement contracts. The PPM stated in a buried disclosure that, "[a]fter the funds held in escrow for the payment of premiums has been depleted, Participants who own beneficial percentages of the policies affected will be required to pay additional premiums to maintain the policy and to keep it in force." The PPM also stated in a buried disclosure that, "[i]f a life insurance company is able to increase the cost of insurance charged for any of the policies, the amounts required to be paid for insurance premiums due for these policies may increase, requiring the investors to incur additional costs to maintain the policies." The PPM also stated in various places that life expectancies are uncertain.

199.    These disclosures did not adequately warn, among other things, that (a) investors were likely to incur additional premiums due to the systematically distorted life expectancies and premium reserves; (b) insurers would raise premiums significantly; (c) the premiums required to be paid by investors would greatly exceed the estimated annual premium amount stated in the PSS; and (d) most investors would likely have to pay premiums earlier than represented.

200.    The PPM's buried disclosures were inadequate to apprise investors of the magnitude, likelihood, and degree of risks presented by the investments. Further, the disclosures failed to disclose material facts—including that JSS was responsible for the life expectancies, the life expectancies were systematically understated, and the insurance companies would substantially raise insurance premiums—necessary to fully evaluate the risks.

**F.  Provident and Its Role in the Scheme**

201.    Provident purports to be only a financial administrator that specializes in overseeing retirement investments accounts, including self-directed IRA and Solo 401(k) accounts. However, Provident has played a much larger role with Conestoga than just that.

202.    An order to show cause issued by the Division of Securities of the Department of Commerce of the State of Utah found that Provident had performed a variety of services for Conestoga, including "acting as custodian for investor funds, recordkeeping, acting as agent liaison, managing the commission distribution process, contract processing, client relations, agent training, and preparing account statements." In addition, the order found that "Provident provides escrow services, such as receiving investor monies, holding life settlement policies, making claims, and receiving and distributing the proceeds.

**a.  Provident's Role as Conestoga's 'Back Office' Administrator**

203.    Provident was a strategic partner of Conestoga from the earliest days and worked closely with them to execute the marketing and sales strategy for the fractional life settlement investments. Provident assisted in implementing the business strategy and developing the marketing materials to sell fractional life settlement contracts to investors through misleading statements, false representations, and material omissions.

204. Provident gave the appearance of being a safeguard for investors. As McDermott once told the master licensee Woods in describing Provident's role, according to Woods' sworn declaration: "How could we possibly commit fraud when we never handle the money? Every dollar in this transaction goes through Provident Trust Group, and it is distributed by them according to their standards and the law." The PPM echoed these sentiments by describing Provident as "independent" and a "check and balance" for the benefit of investors

205. In fact, however, Provident worked for Conestoga, taking direction from McDermott and Conestoga, and running Conestoga's operations (including by handling the payment of all commissions to sales agents, their uplines, and McDermott himself).

206. According to Ralph Trigg, an independent representative that sold to dozens of investors (including several Plaintiffs): "Provident was my primary point of contact for handling any and all issues that arose in relation to the Conestoga investments," and "Provident handled virtually all of the business operations" for Conestoga. Trigg's declaration cited contemporaneous documents—including numerous emails from Provident, ACH payment records, and Provident's direct correspondence with clients—to corroborate his testimony.

207. In an email dated October 23 2015, a Provident employee named Samuel Lee wrote to Rust, one of the master licensees, that "Provident will no longer be the 'back office' provider for Conestoga." The email goes on to explain that "[s]ome of the 'back office' services" provided by Provident "included: Agent Liaison (being the point of contact for agents)[;] Sending contracts for approval[;] Reserving investors into policies[;] Commission Payments[; and] Generating and sending out Confirmation Packets."

208. After Provident quit performing these services, a new company, Strategix, which shares the same principal address as Provident and Bradford, took over this role. According to a sworn declaration by Strategix's founder, Dustin Lewis, Strategix took over the Conestoga "back office and accounting" responsibilities from Provident in February 2016. Lewis stated that, "[w]hen Strategix started these services, Strategix received Conestoga Trust records from the prior service provider, Provident Trust Group."

209. Provident did not effectively withdraw from or renounce the conspiracy when it handed over these duties to Strategix, its affiliated company. On the contrary, Provident continued to be involved in the Conestoga life settlements. In addition, even after Strategix took over, Conestoga continued to use the same PSS form to sell to new investors.

**b. Provident's Role as Conestoga's Marketing Partner**

210. Provident was involved in the creation of Conestoga's marketing materials and approved the materials. Rust said in a sworn declaration that he understood at the time he was working with Conestoga that Provident participated in making a marketing video for Conestoga and that Provident participated in creating the written marketing materials.

211. Likewise, Woods said in a sworn declaration that he believed at the time he worked for Conestoga that Provident had reviewed and approved the written marketing materials before they were issued and that McDermott had told him that Provident had agreed to participate in creating a Conestoga marketing video.

212. Consistent with Woods's and Rust's declarations, in a Conestoga marketing video, Provident's then-CEO Theresa Fette states: "Provident Trust Group is proud to serve as the escrow agent for Conestoga. We receive and hold all participant funds and distribute the funds as necessary. We also assist Conestoga with the customer service and administration."

213. Provident maintained the PSS and often generated the versions of the PSS that were given to Conestoga investors before they decided to invest. The sales agent Trigg stated that Provident handled activities such as finalizing contracts, acting as a go-between with Conestoga's attorneys, paying commissions to sales agents, and resolving "any issues that came up with respect to the policy selection sheets."

214. For instance, when one of Trigg's investors purchased an interest in an oversubscribed policy, Provident's employee Natasha (Ladhar) Betancourt resolved the issue. She emailed Trigg "the most up to date Conestoga Policy Selection Sheet" and told Trigg that the customer "does not have to complete and sign a new P.S.S." and that "[i]f the client would like to make any changes, you can just send me the revisions and we may go from there!" She also

thanked Trigg for a recommendation he had made, saying that "Conestoga & Provident appreciate your suggestion to ensure client satisfaction."

215.    McDermott and Conestoga worked with Provident to design and implement a marketing plan that would target senior investors, including many investors who kept their life savings in traditional IRA and 401k accounts. Provident made it possible for McDermott and the Conestoga Entities to solicit funds from these retirement accounts.

216.    According to Woods, Provident's co-founder Jason Helquist "led" a conference call in or around 2011 with all Conestoga sales agents in which he encouraged the Conestoga agents to "target investors' 401K savings for investments in Conestoga life settlements" and said that Provident was working "very, very diligently" to facilitate this.

217.    Provident also authorized the sale agents to act on its behalf to solicit investors to open 401K or IRA accounts with Provident in order to buy Conestoga life settlements.

218.    At all times, Provident knew about the statements and promises being made to investors and knew that these statements and promises were false and misleading. Provident knew that JSS and McDermott had been involved in the Retirement Value scam because Provident had been involved in Retirement Value. Provident knew, or was willfully blind, that the estimated annual premiums on the PSS did not reflect increasing premium costs because it had access to the underlying life insurance policies as the escrow agent. And Provident knew, or was willfully blind, that the life expectancies provided by JSS were unreliable because JSS had previously provided unreliable life expectancy data for Retirement Value.

### c.    Provident's Role as Escrow Agent

219.    Conestoga and Provident assured investors that Provident had established escrow reserve accounts to pay the future premiums on the policies for the reserve period, and that Provident would manage these escrow reserve accounts for the benefit of investors.

220.    The PPM described Provident's role as "independent escrow agent" on behalf of investors, as follows:

///

///

**Independent Escrow Agent**

The funds placed by a Participant are held by Provident Trust Group, LLC (hereinafter, "Provident"), an escrow agent that is completely independent from any Conestoga entity. Provident disperses fees and commissions and also makes all required periodic premium payments to the insurance companies. The amount of escrow will vary based on the policies in which the Participant chooses to participate. When a policy matures, Provident disperses the funds to the Participants based on their relative percentages interests in the policy.

221.    As noted above, Provident also routinely provided a welcome letter on Provident letterhead in which Provident identified itself as the "Escrow Agent" and provided investors with materially false and misleading information about the investments.

222.    Provident also promised to protect investors by (i) holding the funds belonging to investors for the benefit of the investors; (ii) sufficiently fund each escrow account based on the terms of the underlying policy in which each investor had invested; (iii) disburse the correct amount of fees and commissions that were actually owed by investors under the written terms; and (iv) make all periodic premium payments that were required under the terms to the insurance companies. Provident also referred to itself as "your Escrow Agent" in letters to investors.

223.    Notwithstanding these promises and statements, Provident later abandoned its role as escrow agent in or around 2015 without informing investors. It also claimed in court documents in 2019 and 2020 that it never was the escrow agent for Conestoga and that it had never served any role in the Conestoga investments other than as IRA custodian.

224.    As escrow agent, Provident had access to the underlying insurance policy assets and knew what the premiums were forecasted to be. It also knew that the PSS and Provident welcome letters provided investors with false and misleading information about the life expectancy, escrow reserve period and annual premium costs. Despite having fiduciary duties to investors as the escrow agent, Provident failed to disclose these material facts to investors.

225.    Provident also failed to disclose that it had conflicts of interest because it was affiliated with the purported accountant Bradford and working for Conestoga and McDermott.

### d.    Provident's Role as Payor of Commissions

226.    Another responsibility of Provident was to pay all commissions to sales agents, upline agents, and McDermott out of investors' purchase money. According to Woods and Trigg's

sworn statements, Provident was responsible for paying all of the commissions out of the investors' funds.

227.   The PPM states that commissions would not exceed 10% of face value and would be paid to the sales agent responsible for the sale. However, Provident routinely paid sales commissions that exceeded the amounts stated in the PPM and paid the commissions to persons other than the sales agent, including McDermott.

228.   The Conestoga marketing materials did not disclose that persons other than the sales agent would be paid a commission. Investors were not informed of this fact.

229.   Provident routinely and repeatedly violated its fiduciary duty as escrow agent to make payment only to appropriate persons by paying commissions to persons other than the sales agent, including McDermott himself, without disclosing these payments to investors.

230.   Multiple state authorities have found that Provident paid improper commissions in relation to Conestoga life settlement investments.

231.   The State of Idaho found that "Conestoga did not disclose to investors … that 20% of their investment funds would be used to pay commissions." Despite this non-disclosure, Provident paid this amount of commissions out of investors' funds held in escrow.

232.   The State of Utah found that Conestoga "fail[ed] to disclose that an excessive 20% commission would be paid of investors' principal." Despite this non-disclosure, Provident paid this amount of commissions out of investors' funds held in escrow.

233.   The State of Colorado found that investors were not informed of "material information" that "Conestoga paid out approximately 15% of investor money in the form of commissions" and that "various persons unknown to the ultimate investor made commissions off the sale of Conestoga securities." Despite these non-disclosures, Provident paid this amount of commissions to undisclosed persons out of investors' funds held in escrow.

**G.  JSS and Its Role in the Scheme**

234.   As explained above, JSS provided all of the life insurance policies sold by Conestoga, as well as all of the life expectancy and premium reserve data for the policies. As explained above, the life expectancy and premium reserve data was false and misleading because

-37-

it failed to disclose that the private estimates were much lower than the Social Security data.

235.    McDermott stated in his sworn declaration that "Conestoga Trust purchased all of its policies from Ronald James and his companies James Settlement Services, LLC and James Settlement Services International, LLC."[2]

236.    McDermott's declaration also stated that "[JSS][3] was also responsible for, among other things, calculating the minimum average cost of premium payments that would be necessary on an annual basis to maintain (*i.e.*, to keep in force rather than lapse or terminate due to non-payment) the policies [JSS] offered and sold to Conestoga. … It was [JSS] which determined how much money should be placed in escrow for the payment of premiums in connection with each policy, and this amount was then relied upon and used by Conestoga in the policy selection sheets" that were provided to prospective investors.

237.    McDermott's declaration also states: "For each policy purchased by Conestoga from [JSS] (and then later offered by Conestoga to fractional interest investors such as the Plaintiff), [JSS] calculated the premium that would be necessary to keep the policy in forth through the insured's life expectancy (per the life expectancy estimates provided by [JSS]) plus some number of months which varied from policy to policy."

238.    JSS knew that the life insurance policies in the portfolio were actually worth much less than Conestoga charged investors because JSS had purchased these same policies from the investors. Further, JSS was one of the largest life settlement brokers in the world. JSS knew that no reasonable person would purchase interests in the life insurance policies at the price charged by Conestoga with full knowledge of all material facts related to those policies. This was essentially the same fraudulent activity that JSS engaged in related to Retirement Value.

239.    Accordingly, JSS knew that Conestoga was using the policies and falsified information that it provided Conestoga to defraud investors.

---

[2] According to public records, James Settlement Services International, LLC no longer exists.

[3] McDermott's declaration refers to the two JSS entities collectively as "James."

**H. Bradford and Its Role in the Scheme**

240.    According to the PPM, Bradford was responsible for providing accounting and auditing services over the escrow reserve accounts held by Provident.

241.    The PPM said that the "audit partner" at Bradford was an individual named Dustin Lewis. Mr. Lewis has been indicted on several counts of fraud and recently lost his accounting license for repeated violations of auditor independence requirements.

242.    Conestoga represented to investors that Bradford was an independent accounting firm with no relationship or conflicts of interest with any other companies involved in the marketing, selling, or administration of the Conestoga life settlement investments.

243.    Bradford promised to review the escrow reserve accounts (which were supposed to have been established and maintained by Provident) to provide a further "check and balance" and to protect the integrity of the investments for the benefit of the investors.

244.    Bradford did not reveal that it had a close relationship and conflicts of interest with respect to Provident, the escrow agent whose work Bradford was entrusted to audit. Bradford thus breached its fiduciary duties to the investors.

**I.    Strategix and Its Role in the Scheme.**

245.    After losing his accounting license, the so-called "audit partner" from Bradford, Dustin Lewis, founded Strategix. According to Lewis's sworn declaration he is "the sole member/manager of Strategix Solutions, LLC."

246.    According to Lewis's declaration, "Strategix is a service provider to Conestoga International, LLC" and the "services provided are back office and accounting services." Strategix took over these roles from Provident in or around February 2016.

247.    Investors were never informed that the sole manager and member of Strategix, the new company running Conestoga's back office, was formerly the audit partner at Bradford who had lost his accounting license due to repeated violations of auditor independence rules.

248.    Strategix shares the same principal address and many personnel with Provident and Bradford, and they have a profit-sharing arrangement through their property lease.

249.   Since taking over the back office management role for Conestoga, Strategix has continued to further the fraudulent scheme by making undue premium demands, failing to disclose material facts about the investments, failing to disclose conflicts of interest and undisclosed relationships between the Defendants, and fraudulently concealing from investors facts that would reveal the fraudulent scheme.

**J.   Failures to Disclose Prior Frauds and Adverse Legal Actions**

250.   Several Defendants have been involved in prior frauds and relevant adverse legal actions that were never disclosed to investors but should have been.

251.   As explained above, McDermott and the principals of JSS were each indicted on multiple felony counts for their role in the Retirement Value life settlements scan. Provident was also involved in the Retirement Value scam. Investors were never informed about these Defendants' indictments and involvement with Retirement Value.

252.   Conestoga has been subject to numerous actions by various state agencies related to its sale of life settlement investments to investors, including (a) an August 2, 2012 Arkansas Securities Division Consent Order; (b) a February 6, 2013 California Department of Business Oversight Desist and Refrain Order; (c) a May 30, 2013 Utah Division of Securities Consent Order; (d) an April 10, 2015 Wisconsin Division of Securities Cease and Desist Order; (e) a March 10, 2017 Oklahoma Department of Securities Consent Order; (f) an October 5, 2017 Colorado Division of Securities Consent Order; (g) a July 23, 2018 Idaho Department of Finance, Securities Bureau Consent Order; and (h) a November 29, 2018 North Carolina Securities Division Consent Order. Investors were never informed about these actions.

253.   Bradford's founder, Lance Bradford, and the relationship partner with Conestoga, Dustin Lewis, have each been indicted on multiple felony counts. Lance Bradford was indicted in August 2019 on 28 counts of aiding and assisting in the preparation of false and fraudulent tax returns from 2012 to 2014. In December 2017, Lewis was charged with one count of honest

services fraud and one count of solicitation and bribery of a public official.[4] Investors were never informed about these allegations against Bradford's principals.

254.    In addition, Bradford had its accounting license revoked by the Public Company Accounting Oversight Board, an audit industry watchdog, in 2015 for multiple violations, including repeated violations of auditor independence requirements. Investors were never informed that Bradford had lost its license and been accused of this misconduct in carrying out the very same types of responsibilities it was entrusted to handle for Conestoga investors.

255.    After Bradford lost its accounting license, as explained above, Lewis became the founder and sole manager of Strategix. Investors were never informed that an accused felon who had previously been associated with Bradford ran Strategix.

256.    Each of the above facts would have been material to any reasonable investor.

**K. Defendants' Fraudulent Concealment**

257.    Defendants engaged in an unlawful scheme to prevent investors from discovering the fraud until years after the transaction.

258.    Defendants never provided investors with copies (or access to copies) of the underlying life insurance policies or the policy illustrations that depicted increasing premium costs over time. Investors thus could not determine that the policies actually provided for increasing annual premiums and higher annual premiums than the PSS states.

259.    Investors also had no way to determine that the life expectancies and premium reserve statements were falsified until several years had elapsed. Defendants never provided investors with the underlying data showing that the private life expectancy estimates were significantly lower than the Social Security data for the policies.

260.    Investors had no reason to suspect that the Defendants had undisclosed conflicts of interest and relationships to one another, and Defendants concealed their affiliations with one

---

[4] *See Las Vegas Review-Journal*, "Las Vegas Developer Indicted on Charges of Tax Fraud," (Aug. 28, 2019); Press Release, United States Attorney's Office for the District of Nevada, "Las Vegas Businessman Indicted with 28 Counts for Aiding and Assisting in the Preparation of False Tax Returns," (Aug. 28, 2019); Press Release, United States Attorney's Office for the District of Nevada, "Former Federal Official and Accountant Indicted in Bribery and Fraud Conspiracy," (Dec. 13, 2017).

another by representing to investors that they were "independent" and would serve as "checks and balances" on one another for the benefit of investors.

261. Further, McDermott, Conestoga, Bradford, and Provident each had fiduciary duties to disclose conflicts and reveal fraud to investors. They breached those duties by failing to reveal these facts to investors. Conestoga investors relied on the fiduciary relationships with these Defendants. The investors were not required to question the loyalty of these fiduciaries.

262. Investors did not have any reasons to suspect that they had been victims of a fraudulent scheme at least until they started to receive unexpected premium demands years after they made the initial decision to purchase the investments.

263. Defendants also concealed the fraud by continuing to provide assurances that policies would mature soon, claiming that premium cost increases had not been expected, and failing to disclose material facts. For example, in January 2020, Conestoga sent a letter to all Conestoga investors stating that Conestoga "expect[s] numerous maturities this year, and that the frequency and number of maturities will increase." The letter stated that "policies have not matured as soon as predicted by the life expectancy providers who issued life expectancy estimates for the insureds" and that the "companies that issued these reports were not and have never been affiliated with Conestoga in any way." The letter concludes that "Conestoga apologizes that this investment has not turned out as anticipated by all concerned."

264. The letter conceals numerous material facts, including that (a) Conestoga knew the costs of premiums would increase over time; (b) Conestoga knew the policies and life expectancy were obtained from JSS, a company with whom McDermott had previously worked and who had been accused of providing fraudulent data regarding life insurance policies; (c) Conestoga knew the private life expectancy estimates were much shorter than the Social Security data; and (d) Conestoga knew that the remaining life expectancy (as of the date of the letter) for the insured persons on the policies would likely be several additional years in the future.

265. Various Defendants also concealed the fact that they have been subject to various adverse state actions and criminal indictments related to the sale of life settlements and other securities. Defendants failed to disclose these adverse actions despite having a duty to disclose.

-42-

266.    In addition, the statute of limitations has been tolled as to all Plaintiffs since June 4, 2019, when a putative class action regarding the Conestoga life settlement investments was filed in a Texas action and later removed to the U.S. District Court for the Northern District of Texas. The court in that case has not yet ruled on the motion to certify the class, and the case has been stayed pending arbitration of one named plaintiff's claims against Provident.

## V.  CLASS ALLEGATIONS

267.    Plaintiffs bring the claims asserted below both on behalf of themselves and those similarly situated. The putative class consists of all persons who purchased an interest in Conestoga life settlements. Excluded are (a) any representatives, employees, agents, or attorneys of any Defendant, and (b) any person that has executed a valid release of relevant claims related to their purchase of Conestoga life settlements against any Defendant.

268.    There are two subclasses within the class. The first subclass (the "Non-Securities Fraud Class") comprises all class members whose PSS is dated more than five (5) years before the filing date of this complaint. The second subclass (the "Securities Fraud Class") comprises all class members whose PSS is dated five (5) years or less before the filing date of this complaint.

269.    It is expected that Plaintiffs Ken Lane, Thomas Durliat, and Luis Martinez will serve as class representatives for the Non-Securities Fraud Class, and that Plaintiffs Benita Luke and David Kenney will serve as class representatives for the Securities Fraud Class. However, Plaintiffs may move to certify the class with additional or different class representatives, if appropriate under the law and the Court's rules.

270.    The injured classes consist of over 1,000 investors, and each subclass consists of many investors spread throughout the country. Therefore, the classes are so numerous that joinder of all members would be impracticable.

271.    There are numerous questions of law or fact common to the class, including whether the PSS and written marketing materials contained fraudulent misrepresentations and omissions, whether Defendants committed fraud with respect to the life expectancies and premium information, whether Defendants' misrepresentations and omissions were material to reasonable participants, whether reasonable participants would have relied on those misrepresentations and

omissions, and whether Defendants breached fiduciary duties to the class. There are also common questions related to the class injunctive relief requested, including whether the Court should grant a full accounting to the class and whether a receiver should be appointed to manage the Conestoga life insurance assets going forward.

272.    Plaintiffs' claims are typical of the claims of the class. Like other participants, Plaintiffs purchased an interest in the life settlements under false pretenses based on the false and misleading statements and failures to disclose material facts. In addition, Defendants breached fiduciary duties to the Plaintiffs by participating in an unlawful conspiracy against them, failing to disclose conflicts, and paying improper commissions, among other misconduct.

273.    Plaintiffs will fairly and adequately protect the interests of the class because they have no conflicts of interests with the class and have retained competent counsel to investigate and litigate the claims on behalf of the class.

274.    A class action is appropriate under Rule 23(b)(1)(b) because adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. In particular, individual adjudications create a substantial risk that the underlying life insurance policies may lapse, causing absentees to lose the full value of their initial investment with little or no recourse.

275.    A class action is also appropriate under Rule 23(b)(3) because common questions of law and fact predominate over questions affecting individual class members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy.

### VI.  INDIVIDUAL ALLEGATIONS

#### A.  Adina Lawson

276.    Adina Lawson purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $30,000 on or about November 1, 2013.

277.    The sales agent who sold Lawson the policies was Jeff Converse.

278.    At the time of her purchase, Conestoga and Provident represented to Lawson that the life expectancies on the policies in her portfolio were 51, 39, 58, 48.5, 48, and 61 months,

respectively, and that the premium reserve periods on the policies were 63, 51, 70, 60.5, 60, and 91 months, respectively.

279. Lawson relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

280. None of the policies in Lawson's portfolio have matured and paid a benefit.

281. Lawson has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**B. Allen Ford**

282. Allen Ford purchased an interest in twelve (12) Conestoga life settlement policies for a total purchase price of $175,000 on or about October 2014, November 2014, and January 2015.

283. The sales agent who sold Ford the policies was Joshua Schlinsky.

284. At the time of his purchase, Conestoga and Provident represented to Ford that the life expectancies on the policies in his portfolio were a certain number of months and that the premium reserve periods on the policies were at least twelve months greater than the life expectancies on each policy. Mr. Ford does not recall the exact number of months stated.

285. Ford relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

286. None of the policies in Ford's portfolio have matured and paid a benefit.

287. Ford has been demanded to make, and has made, additional premium payments on the policies in his portfolio. To the best of Ford's recollection, some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

### C.  Bill and Mary Kay Doubek

288.    Bill Doubek purchased an interest in six (6) Conestoga life settlement policies for a total purchase price of $250,000 on or about April 7, 2016.

289.    Mary Kay Doubek purchased an interest in nine (9) Conestoga life settlement policies for a total purchase price of $477,850 on or about August 9, 2013.

290.    The sales agent who sold the Doubeks the policies was Ralph Trigg.

291.    At the time of his purchase, Conestoga represented to Bill Doubek that the life expectancies on the policies in his portfolio were 70, 61, 89, 34, 67, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 73, 101, 46, 79, and 70 months, respectively.

292.    At the time of her purchase, Conestoga and Provident represented to Mary Kay Doubek that the life expectancies on the policies in her portfolio were 51, 40.5, 48, 48.5, 55, 61, 65, 66, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 76.5, 60, 60.5, 67, 91, 77, 78, and 84 months, respectively.

293.    The Doubeks relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

294.    None of the policies in Bill Doubek's portfolio have matured and paid a benefit. Only one of the policies in Mary Kay Doubek's portfolio has matured and paid a benefit.

295.    Both Bill and Mary Kay Doubek have been demanded to pay, and have paid, additional premium payments on the policies in their respective portfolios. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium amount.

### D.  Carter Trust

296.    Plaintiff Carter Trust purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $400,000 on or about February 22, 2013.

297.    The sales agent who sold the Carter Trust the policies was Ralph Trigg.

298. At the time of the purchase, Conestoga and Provident represented to the Carter Trust that the life expectancies on the policies in its portfolio were 39, 40.5, 50.5, 54, 55.5, 55.5, 44, 52, and 61 months, respectively, and that the premium reserve periods on the policies were 75, 76.5, 80.5, 84, 85.5, 85.5, 80, 88, and 91 months, respectively.

299. Carter Trust relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

300. Only one of the policies in the Carter Trust portfolio has matured and paid a benefit.

301. The Carter Trust has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**E.  Michi Sato**

302. Michi Sato purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $71,175 on or about August 30, 2013.

303. The sales agent who sold Michi Sato the policies was Bill Grigorieff.

304. At the time of her purchase, Conestoga and Provident represented to Michi Sato that the life expectancies on the policies in her portfolio were 51, 39, 58, 48.5, 48, 61, 65, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 51, 70, 60.5, 60, 91, 77, 86, and 84 months, respectively.

305. Michi Sato relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

306. None of the policies in Michi Sato's portfolio have matured and paid a benefit.

307. Michi Sato has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

308. Conestoga, Strategix, and Provident purported to forfeit Michi Sato's interest in at least one policy for not paying the premiums demanded.

**F. Philip Stark**

309. Philip Stark purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $250,000 on or about November 2013.

310. The sales agent who sold Stark the policies was Ralph Trigg.

311. At the time of his purchase, Conestoga and Provident represented to Stark that the life expectancies on the policies in his portfolio were 66, 39, 58, 48, 61, 74, and 36 months, respectively, and that the premium reserve periods on the policies were 78, 51, 70, 60, 91, 86, and 48 months, respectively.

312. Stark relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

313. None of the policies in Stark's portfolio have matured and paid a benefit.

314. Stark has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**G. Stark Trust**

315. Stark Trust purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $50,000 on or about December 2014.

316. The sales agent who sold Stark Trust the policies was Ralph Trigg.

317. At the time of its purchase, Conestoga and Provident represented to Stark Trust that the life expectancies on the policies in its portfolio were 65, 51, 76, 62, 76, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 77, 63, 88, 74, 88, 61, and 93 months, respectively.

318. Stark Trust relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

319. None of the policies in Stark Trust's portfolio have matured and paid a benefit.

320. Stark Trust has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**H. Thomas Durliat**

321. Thomas Durliat purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of about $284,000 on or about December 23, 2014.

322. The sales agent who sold Durliat the policies was Joshua Schlinsky.

323. At the time of his purchase, Conestoga and Provident represented to Durliat that the life expectancies on the policies in his portfolio were 76, 62, 49, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 88, 74, 61, 93, 86, and 84 months, respectively.

324. Durliat relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

325. None of the policies in Durliat's portfolio have matured and paid a benefit.

326. Durliat has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**I. Patrick Amoriello**

327. Patrick Amoriello purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $88,000 on or about September 2, 2014.

328. The sales agent who sold Amoriello the policies was Joshua Schlinsky.

329. At the time of his purchase, Conestoga and Provident represented to Amoriello that the life expectancies on the policies in his portfolio were 75, 65, 76, 67, 62, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 87, 77, 88, 79, 74, 61, and 93 months, respectively.

330. Amoriello relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

331. None of the policies in Amoriello's portfolio have matured and paid a benefit.

332. Amoriello has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**J.  Luis Martinez**

333. Luis Martinez purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $250,000 on or about February 2015.

334. The sales agent who sold Martinez the policies was Joshua Schlinsky.

335. At the time of his purchase, Conestoga and Provident represented to Martinez that the life expectancies on the policies in his portfolio were 62, 76, 81, 34, and 72 months, respectively, and that the premium reserve periods on the policies were 74, 88, 93, 46, and 84 months, respectively.

336. Martinez relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

337. None of the policies in Martinez's portfolio have matured and paid a benefit.

338. Martinez has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**K. Louann Spiegel**

339.    Louann Spiegel purchased an interest in fourteen (14) Conestoga life settlement policies for an initial purchase price of about $177,790.14 on or about November 2013, January 2014, May 2014, July 2014, and August 2014.

340.    The sales agent who sold Spiegel the policies was Jeff Converse.

341.    At the time of her purchases, Conestoga and Provident represented to Spiegel that the life expectancies on some of the policies in her portfolio were 39, 35, 48, 61, 36, 36, 75, 65, 76, 76, 81, 51 months, respectively, and that the premium reserve periods on these policies were 51, 47, 60, 91, 48, 48, 87, 77, 88, 88, 93, and 63 months, respectively.

342.    There are also two policies (PM1213TL and PM1213TL2) for which Spiegel has been unable to locate the original life expectancy information provided.

343.    Spiegel relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

344.    Only one of the policies in Spiegel's portfolio has matured and paid a benefit.

345.    Spiegel has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

346.    Conestoga, Strategix, and Provident have purported to forfeit Spiegel's interest in at least one policy for not paying premiums demanded.

**L. Jodie Baedeker**

347.    Jodie Baedeker purchased an interest in four (4) Conestoga life settlement policies for an initial purchase price of $150,000 on or about May 2015.

348.    The sales agent who sold Baedeker the policies was Ralph Trigg.

349.    At the time of her purchase, Conestoga and Provident represented to Baedeker that the life expectancies on the policies in her portfolio were 70, 70, 81, and 34 months, respectively, and that the premium reserve periods on the policies were 82, 82, 93, and 46 months, respectively.

350. Baedeker relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

351. None of the policies in Baedeker's portfolio have matured and paid a benefit.

352. Baedeker has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**M. Eberle Trust**

353. Eberle Trust purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $242,702 on or about March 10, 2017.

354. The sales agent who sold Eberle the policies was Ralph Trigg.

355. At the time of his purchase, Conestoga and Strategix represented to Eberle Trust that the life expectancies on the policies in its portfolio were short and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy.

356. Eberle Trust relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

357. Only one of the policies in Eberle Trust's portfolio has matured and paid a benefit.

358. Eberle Trust has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**N. Benita Luke**

359. Benita Luke purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $250,000 on or about September 28, 2015.

360. The sales agent who sold Luke the policies was Ralph Trigg.

361.    At the time of her purchase, Conestoga and Provident represented to Luke that the life expectancies on the policies in her portfolio were 70, 70, 34, 61, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 82, 46, 73, and 70 months, respectively.

362.    Luke relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

363.    None of the policies in Luke's portfolio have matured and paid a benefit.

364.    Luke has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**O. Ren Bevell**

365.    Ren Bevell purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $136,364 on or about January 15, 2015.

366.    The sales agent who sold Bevell the policies was Crev Cerillo.

367.    At the time of his purchase, Conestoga and Provident represented to Bevell that the life expectancies on the policies in his portfolio were 76, 62, 76, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 61, and 93 months, respectively.

368.    Bevell relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

369.    None of the policies in Bevell's portfolio have matured and paid a benefit.

370.    Bevell has been demanded to make additional premium payments on the policies in his portfolio. Some of these payment demands occurred before the expiration of the represented premium reserve period on the relevant policies, and the payments demanded exceeded the estimated annual premium.

371. Conestoga, Strategix, and Provident purported to forfeit Bevell's interest in at least one policy for not paying the premiums demanded.

**P. Karen Miles**

372. Karen Miles purchased an interest in three (3) Conestoga life settlement policies for an initial purchase price of $250,000 on or about December 2016.

373. The sales agent who sold Miles the policies was Ralph Trigg.

374. At the time of her purchase, Conestoga and Strategix represented to Miles that the life expectancies on the policies in her portfolio were 89, 34, and 58 months, respectively, and that the premium reserve periods on the policies were 101, 46, and 70 months, respectively.

375. Miles relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

376. None of the policies in Miles's portfolio have matured and paid a benefit.

377. Miles has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**Q. Gary and Rosalyn Musacco**

378. Gary and Rosalyn Musacco purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $200,000 on or about January 2015.

379. The sales agent who sold the Musaccos the policies was Ralph Trigg.

380. At the time of his purchase, Conestoga represented to the Musaccos that the life expectancies on the policies in their portfolio were 70, 70, 81, 34, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 82, 93, 46, and 70 months, respectively.

381. The Musaccos relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolio, among other material misrepresentations and omissions.

382.    None of the policies in the Musaccos' portfolio have matured and paid a benefit.

383.    The Musaccos have been demanded to make, and have made, additional premium payments on the policies in their portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**R. Oliphant Trust**

384.    Oliphant Trust purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $200,000 on or about March 2015.

385.    The sales agent who sold Oliphant Trust the policies was Ralph Trigg.

386.    At the time of its purchase, Conestoga and Provident represented to Oliphant Trust that the life expectancies on the policies in his portfolio were 76, 62, 76, 49, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 61, 93, 86, and 84 months, respectively.

387.    Oliphant Trust relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

388.    None of the policies in Oliphant Trust's portfolio have matured and paid a benefit.

389.    Oliphant Trust has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**S. Stephen Ragsdale**

390.    Stephen Ragsdale purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $45,557 on or about May 2014.

391.    The sales agent who sold Ragsdale the policies was Derek Anderson.

392.    At the time of his purchase, Conestoga and Provident represented to Ragsdale Trust that the life expectancies on the policies in his portfolio were 75, 86, 75, 51, and 81 months,

respectively, and that the premium reserve periods on the policies were 87, 98, 87, 63, and 93 months, respectively.

393.    Ragsdale relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

394.    None of the policies in Ragsdale's portfolio have matured and paid a benefit.

395.    Ragsdale has been demanded to make additional premium payments on the policies in his portfolio. Some of these payment demands occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payment demands exceeded the estimated annual premium.

396.    Conestoga, Strategix, and Provident purported to forfeit Ragsdale's interest in at least one policy for not paying the premiums demanded.

**T.  Leslie Reed**

397.    Leslie Reed purchased an interest in four (4) Conestoga life settlement policies for an initial purchase price of $25,000 on or about April 30, 2014.

398.    The sales agent who sold Reed the policies was Derek Anderson.

399.    At the time of her purchase, Conestoga and Provident represented to Reed that the life expectancies on the policies in her portfolio were 75, 75, 51, and 81 months, respectively, and that the premium reserve periods on the policies were 87, 87, 63, and 93 months, respectively.

400.    Reed relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

401.    None of the policies in Reed's portfolio have matured and paid a benefit.

402.    Reed has been demanded to make additional premium payments on the policies in her portfolio. Some of these demanded payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these demanded payments exceeded the estimated annual premium.

403. Conestoga, Strategix, and Provident purported to forfeit Reed's interest in multiple policies for not paying the premiums demanded. The premium demand notices related to these "forfeited" policies were not sent to Reed's home address or current work address, and she did not receive actual notice of them prior to the purported forfeiture.

**U. Chet Reilly**

404. Chet Reilly purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $67,200.76 on or about May 15, 2014.

405. The sales agent who sold Reilly the policies was Derek Anderson.

406. At the time of his purchase, Conestoga and Provident represented to Reilly that the life expectancies on some of the policies in his portfolio were 75, 86, 81, and 75 months respectively, and that the premium reserve periods on these policies were 87, 98, 93, and 87 months respectively. Reilly cannot recall exactly what the represented life expectancies and premium reserve periods were on the remaining three policies. On each policy, the premium reserve periods were said to be at least twelve months longer than the life expectancies.

407. Reilly relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

408. None of the policies in Reilly's portfolio have matured and paid a benefit.

409. Reilly has been demanded to make additional premium payments on the policies in his portfolio. Some of these demanded payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these demanded payments exceeded the estimated annual premium.

410. Conestoga, Strategix, and Provident purported to forfeit Reilly's interest in at least one policy for not paying the premiums demanded.

**V. William Spaak**

411. William Spaak purchased an interest in eleven (11) Conestoga life settlement policies for an initial purchase price of $100,000 on or about October 12, 2012.

412. The sales agent who sold William Spaak the policies was Ralph Trigg.

413. At the time of his purchase, Conestoga and Provident represented to William Spaak that the life expectancies on the policies in his portfolio were 39, 40.5, 50.5, 50.5, 50.5, 54, 55.5, 55.5, 44, 52, and 61months, respectively, and that the premium reserve periods on the policies were 75, 76.5, 80.5, 86.5, 86.5, 84, 85.5, 85.5, 80, 88, and 91 months, respectively.

414. William Spaak relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

415. None of the policies in William Spaak's portfolio have matured and paid a benefit.

416. William Spaak has been demanded to make additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium

417. Conestoga, Provident, and Strategix purported to forfeit William Spaak's interest in at least one policy for not paying demanded premiums.

**W. Robert Spaak**

418. Robert Spaak purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $200,000 on or about January 2015.

419. The sales agent who sold Robert Spaak the policies was Ralph Trigg.

420. At the time of his purchase, Conestoga and Provident represented to Robert Spaak that the life expectancies on the policies in his portfolio were 76, 62, 76, 49, and 81months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 61, and 93 months, respectively.

421. Robert Spaak relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

422. None of the policies in Robert Spaak's portfolio have matured and paid a benefit.

423. Robert Spaak has been demanded to make additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented

premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

424.    Conestoga, Strategix, and Provident purported to forfeit Robert Spaak's interest in at least one policy for not paying demanded premiums.

**X.  Whaley**

425.    Whaley purchased an interest in ten (10) Conestoga life settlement policies for an initial purchase price of $75,000 on or about November 8, 2013.

426.    The sales agent who sold Whaley the policies was Ralph Trigg.

427.    At the time of its purchase, Conestoga and Provident represented to Whaley that the life expectancies on the policies in its portfolio were 66, 39, 58, 48.5, 48, 61, 65, 74, 36, and 72 months, respectively, and that the premium reserve periods on the policies were 78, 51, 70, 60.5, 91, 77, 86, 48, and 84 months, respectively.

428.    Whaley relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

429.    Only one of the policies in Whaley's portfolio has matured and paid a benefit. Another policy in Whaley's portfolio "matured" in that the insured person passed away, but the policy did not pay a benefit because it was determined to be unenforceable.

430.    Whaley has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**Y.  Hallie Aldridge**

431.    Hallie Aldridge purchased an interest in four (4) Conestoga life settlement policies for an initial purchase price of $400,000 on or about September 6, 2016.

432.    The sales agent who sold Aldridge the policies was Ralph Trigg.

433. At the time of her purchase, Conestoga and Strategix represented to Aldridge that the life expectancies on the policies in her portfolio were 61, 89, 34, and 58 months, respectively, and that the premium reserve periods on the policies were 73, 101, 46, and 70 months, respectively.

434. Aldridge relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

435. None of the policies in Aldridge's portfolio have matured and paid a benefit.

436. Aldridge has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**Z. Norman and Ellen Christianson**

437. Norman and Ellen Christianson purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $300,000 on or about June 14, 2016.

438. The sales agent who sold the Christiansons the policies was Ralph Trigg.

439. At the time of their purchase, Conestoga and Strategix represented to the Christiansons that the life expectancies on the policies in their portfolio were 70, 61, 89, 34, 67, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 73, 101, 46, 79, and 70 months, respectively.

440. The Christiansons relied on Conestoga and Strategix's representations regarding the life expectancies and premiums on the policies in their portfolio, among other material misrepresentations and omissions.

441. None of the policies in the Christiansons' portfolio have matured and paid a benefit.

442. The Christiansons have been demanded to make, and have made, additional premium payments on at least one of the policies in their portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

### AA.    Margaret Cowens

443.    Margaret Cowens purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $50,000 on or about September 26, 2013.

444.    The sales agent who sold the Cowens the policies was Ralph Trigg.

445.    At the time of her purchase, Conestoga and Provident represented to Cowens that the life expectancies on the policies in her portfolio were 51, 39, 58, 48.5, 48, 61, 65, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 51, 70, 60.5, 60, 91, 77, 86, and 84 months, respectively.

446.    Cowens relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

447.    None of the policies in the Cowens' portfolio have matured and paid a benefit. One policy matured in that the insured person died, but the policy did not pay a benefit.

448.    Cowens has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

### BB.    John "Rich" Dancaster

449.    Rich Dancaster purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $178,000 on or about September 12, 2014 (five policies) and January 26, 2015 (two policies).

450.    The sales agent who sold Dancaster the policies was Joshua Schlinsky.

451.    At the time of his purchase, Conestoga and Provident represented to Dancaster that the life expectancies on the policies in his portfolio were 65, 76, 62, 49, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 77, 88, 74, 61, 93, 86, and 84 months, respectively.

452. Dancaster relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

453. None of the policies in Dancaster's portfolio have matured and paid a benefit.

454. Dancaster has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**CC.    David and Laurie Greenfield**

455. David and Laurie Greenfield purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of $70,000 on or about July 2014 (six policies) and October 2014 (one additional policy).

456. The sales agent who sold the Greenfields the policies was Jace McDonald.

457. At the time of his purchase, Conestoga and Provident represented to the Greenfields that the life expectancies on the policies in their portfolio were 65, 76, 67, 62, 76, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 77, 88, 79, 74, 88, 61, and 93 months, respectively.

458. The Greenfields relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolio, among other material misrepresentations and omissions.

459. None of the policies in the Greenfield's portfolio have matured and paid a benefit.

460. The Greenfields have been demanded to make, and have made, additional premium payments on the policies in their portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**DD.    Richard Guiry**

461. Richard Guiry purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $30,000 on or about November 1, 2013.

-62-

462. The sales agent who sold Guiry the policies was William "Doc" Gallagher.

463. At the time of his purchase, Conestoga and Provident represented to Guiry that the life expectancies on three of the policies in his portfolio were 51, 75, and 61 months, respectively, and that the premium reserve periods on these policies were 63, 87, and 91 months, respectively. Other policy numbers in Guiry's portfolio do not appear to match up with the policy numbers stated on the policy selection sheet provided to Guiry. In any event, Conestoga and Provident did represent that the premium reserve period was at least twelve months longer than the life expectancies on each policy in Guiry's portfolio.

464. Guiry relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

465. One of the policies in Guiry's portfolio matured and paid a benefit shortly after the initial purchase, and all of the proceeds from that policy were reinvested in another policy, increasing Guiry's total purchase price to $31,604.17 for six policies.

466. Guiry has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**EE.       Lynn Corwin-Hernandez**

467. Lynn Corwin-Hernandez purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $99,515 on or about February 2015.

468. The sales agent who sold Corwin-Hernandez the policies was Ralph Trigg.

469. At the time of her purchase, Conestoga and Provident represented to Corwin-Hernandez that the life expectancies on the policies in her portfolio were 76, 62, 76, 61, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 93, 86, and 84 months, respectively.

470.    Corwin-Hernandez relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

471.    None of the policies in Corwin-Hernandez's portfolio have matured and paid a benefit.

472.    Corwin-Hernandez has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**FF.    Keith and Lisa Jaroslow**

473.    Keith Jaroslow purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $25,000 on or about May 4, 2015.

474.    Lisa Jaroslow purchased an interest in four (4) Conestoga life settlement policies for an initial purchase price of $24,752.39 on or about May 4, 2015

475.    The sales agent who sold the Jaroslows the policies was Ralph Trigg.

476.    At the time of his purchase, Conestoga and Provident represented to Keith Jaroslow that the life expectancies on the policies in his portfolio were 62, 76, 81, 51, and 34 months, respectively, and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy.

477.    At the time of her purchase, Conestoga and Provident represented to Lisa Jaroslow that the life expectancies on the policies in her portfolio were 76, 62, 81, and 34 months, respectively, and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy.

478.    The Jaroslows relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

479.    None of the policies in the Jaroslows' portfolios have matured and paid a benefit.

480.    The Jaroslows have been demanded to make, and have made, additional premium payments on the policies in their portfolios. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**GG.    Kenneth (Ken) and Deatra (Dee) Lane**

481.    Ken Lane purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $149,618 on or about July 10, 2013.

482.    Dee Lane purchased an interest in the same nine (9) Conestoga life settlement policies for an initial purchase price of $75,969 on or about August 2013.

483.    The sales agent who sold the Lanes the policies was Bill Grigorieff.

484.    At the time of the purchase, Conestoga and Provident represented to Ken and Dee Lane that the life expectancies on the policies in each of their portfolios were 51, 40.5, 48, 48.5, 55, 61, 65, 66, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 76.5, 60, 60.5, 67, 91, 77, 78, and 84 months, respectively.

485.    The Lanes relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

486.    None of the policies in the Lanes' portfolios have matured and paid a benefit. One policy did "mature" in the sense that the insured person passed away, but even that policy did not pay a benefit because it was determined to be unenforceable. Conestoga has not replaced the policy that was found to be unenforceable.

487.    The Lanes have been demanded to make, and have made, additional premium payments on the policies in their portfolios. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

488.    Conestoga, Strategix, and Provident purported to forfeit the Lanes' interests in at least one policy for not paying a demanded premium.

**HH.    Jill McGovern**

489.    Jill McGovern purchased an interest in eight (8) Conestoga life settlement policies for an initial purchase price of $150,000 on or about March 2016.

490.    The sales agent who sold McGovern the policies was Ralph Trigg.

491.    At the time of the purchase, Conestoga and Strategix represented to McGovern that the life expectancies on the policies in her portfolio were 70, 70, 61, 89, 34, 64, 67, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 82, 73, 101, 46, 76, 79, and 70 months, respectively.

492.    McGovern relied on Conestoga and Strategix's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

493.    None of the policies in McGovern's portfolio have matured and paid a benefit.

494.    McGovern has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**II.  Williams Trust**

495.    Williams Trust purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $145,649 on or about April 24, 2017.

496.    The sales agent who sold Williams Trust the policies was Ralph Trigg.

497.    At the time of the purchase, Conestoga and Strategix represented to Williams Trust that, as of June 2012, the life expectancies on four of the policies in its portfolio was 50.5, 61, 40.5, and 39 months, respectively, and that the premium reserve periods on these policies were 80.5, 91, 76.5, and 75 months, respectively.

498.    Williams Trust relied on Conestoga and Strategix's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

499.    Only one of the policies in Williams Trust's portfolio has matured and paid a benefit. The actual payout on that policy was only $25,416.85, even though the PSS stated that the payout at maturity for that policy would be $42,384.

500.    Williams Trust has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**JJ. Lowell Orren**

501.    Orren purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $100,000 on or about September 11, 2014.

502.    The sales agent who sold Orrenthe policies was Joshua Schlinsky.

503.    At the time of the purchase, Conestoga and Provident represented to Orren that the life expectancies on the policies in his portfolio were 65, 76, 67, 62, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 77, 88, 79, 74, 61, and 93months, respectively.

504.    Orren relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

505.    None of the policies in Orren's portfolio have matured and paid a benefit.

506.    Orren has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**KK.    Jed Firebaugh**

507.    Firebaugh purchased an interest in ten (10) Conestoga life settlement policies for an initial purchase price of $50,000 on or about May 15, 2013 (six policies); December 18, 2013 (one policy); May 26, 2014 (one policy); and September 27, 2014 (two policies).

508.    The sales agent who sold Firebaugh the policies was Gary Franke.

509.    At the time of the purchase, Conestoga and Provident represented to Firebaugh that the life expectancies on the policies in his portfolio were 39, 48, 55, 61, 72, 76, 36, 51, 62, and 49 months, respectively, and that the premium reserve periods on the policies were 75, 60, 67, 91, 84, 88, 48, 63, 74, and 61 months, respectively.

510.    Firebaugh relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

511.    None of the policies in Firebaugh's portfolio have matured and paid a benefit.

512.    Firebaugh has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**LL.    Karen Wiley**

513.    Karen Wiley purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $81,000 on or about July 27, 2014

514.    The sales agent who sold Wiley the policies was Charles Wiggington.

515.    At the time of the purchase, Conestoga and Provident represented to Wiley that the life expectancies on the policies in her portfolio were 75, 65, 76, 76, and 81 months, respectively, and that the premium reserve periods on the policies were 87, 77, 88, 88, and 93months, respectively.

516.    Wiley relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

517.    None of the policies in Wiley's portfolio have matured and paid a benefit.

518.    Wiley has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

519.   Conestoga, Provident, and Strategix purported to forfeit Wiley's interest in at least one policy for not paying premiums demanded.

**MM.      Barbara Carrillo**

520.   Barbara Carrillo purchased an interest in four (4) Conestoga life settlement policies for an initial purchase price of $25,525 on or about September 2014.

521.   The sales agent who sold Hamlin the policies was Crevenne Carrillo.

522.   At the time of the purchase, Conestoga and Provident represented to Carrillo that the life expectancies on the policies in her portfolio were 76, 76, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 88, 88, 61, and 93 months, respectively.

523.   Carrillo relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

524.   None of the policies in Carrillo's portfolio have matured and paid a benefit.

525.   Carrillo has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**NN.      Linda MacTaggart**

526.   Linda MacTaggart purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $389,500 on or about February 2014 (seven policies) and May 2014 (two policies).

527.   The sales agent who sold MacTaggart the policies was Ralph Trigg.

528.   At the time of the purchase, Conestoga and Provident represented to MacTaggart that the life expectancies on the policies in her portfolio were 51, 81, 40, 40, 35, 75, 61, 33, and 81 months, respectively, and that the premium reserve periods on the policies were 63, 93, 52, 52, 47, 87, 91, 45, and 93 months, respectively.

529. MacTaggart relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

530. Only two of the policies in MacTaggart's portfolio have matured and paid a benefit. The payout on at least one of the policies that matured was several thousand dollars less than represented.

531. MacTaggart has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**OO.    Dennis Blough**

532. Dennis Blough purchased an interest in one (1) Conestoga life settlement policies for an initial purchase price of $35,000 on or about November 11, 2015

533. The sales agent who sold Blough the policy was Dale Tenhulzen.

534. At the time of the purchase, Conestoga and Provident represented to Blough that the life expectancy on the policy in his portfolio was 89 months and that the premium reserve period was 101 months.

535. Blough relied on Conestoga and Provident's representations regarding the life expectancy and premiums on the policy in his portfolio, among other material misrepresentations and omissions.

536. The policy in Blough's portfolio has not matured and paid a benefit.

537. Blough has been demanded to make an additional premium payment on the policy in his portfolio before the expiration of the represented premium reserve period.

**PP.    Carolyn Demery**

538. Carolyn Demery purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $55,000 on or about April 27, 2015.

539. The sales agent who sold Demery the policies was Larry Powell.

540.   At the time of the purchase, Conestoga and Provident represented to Demery that the life expectancies on the policies in her portfolio were 34, 61, 81, 58, 70, and 62 months, respectively, and that the premium reserve periods on the policies were 46, 73, 93, 70, and 82 months, respectively, on the first five policies. Demery cannot recall the premium reserve period stated on the last policy, but it was at least twelve months longer than the life expectancy.

541.   Demery relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

542.   None of the policies in Demery's portfolio have matured and paid a benefit.

543.   Demery has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**QQ.   Zeitzer Trust**

544.   Zeitzer Trust purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $500,000 on or about March 13, 2013.

545.   The sales agent who sold Zeitzer Trust the policies was Ralph Trigg.

546.   At the time of the purchase, Conestoga and Provident represented to Zeitzer Trust that the life expectancies on the policies in its portfolio were 39, 40.5, 50.5, 54, 55.5, 55.5, 44, 52, and 61 months, respectively, and that the premium reserve periods on the policies were 75, 76.5, 80.5, 84, 85.5, 85.5, 80, 88, and 91 months, respectively.

547.   Zeitzer Trust relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

548.   Only one of the policies in Zeitzer Trust's portfolio has matured and paid a benefit.

549.   Zeitzer Trust has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration

of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**RR.      Gregory Weiss**

550.    Gregory Weiss purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $89,675 on or about February 11, 2015.

551.    The sales agent who sold Weiss the policies was John Hayes.

552.    At the time of the purchase, Conestoga and Provident represented to Weiss that the life expectancies on the policies in his portfolio were 76, 62, 76, 48, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were at least twelve months greater than the life expectancies on each policy.

553.    Weiss relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

554.    None of the policies in Weiss's portfolio have matured and paid a benefit.

555.    Weiss has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**SS.      Steven Blauvelt and Gay Sato**

556.    Steven Blauvelt and Gay Sato purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $90,000 on or about September 2013.

557.    The sales agent who sold Blauvelt and Gay Sato the policies was Bill Grigorieff.

558.    At the time of the purchase, Conestoga and Provident represented to Blauvelt and Gay Sato that the life expectancies on the policies in their portfolio were 51, 39, 58, 48.5, 48, 61, 65, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 51, 70, 60.5, 60, 91, 77, 86, and 84 months, respectively.

559. Blauvelt and Gay Sato relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolio, among other material misrepresentations and omissions.

560. None of the policies in Blauvelt and Gay Sato's portfolio have matured and paid a benefit.

561. Blauvelt and Gay Sato have been demanded to make, and have made, additional premium payments on the policies in their portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

562. Conestoga, Strategix, and Provident have purported to forfeit Blauvelt and Gay Sato's interest in at least one policy for not paying the premiums demanded.

**TT.    Turner Trust and Turner LLC**

563. Turner Trust and Turner LLC purchased an interest in ten (10) Conestoga life settlement policies, collectively, for an initial purchase price of $100,000 and $200,000, respectively, on or about January 2013.

564. The sales agent who sold Turner Trust and Turner LLC the policies was Ralph Trigg.

565. At the time of the purchases, Conestoga and Provident represented to Turner Trust and Turner LLC that the life expectancies on the policies in their portfolios were 39, 40.5, 50.5, 50.5, 54, 55.5, 55.5, 44, 52, and 61 months, respectively, and that the premium reserve periods on the policies were 75, 76.5, 80.5, 86.5, 84, 85.5, 85.5, 80, 88, and 91 months, respectively.

566. Turner Trust and Turner LLC relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

567. Two of the policies in Turner Trust's and Turner LLC's portfolios have matured and paid a benefit.

568. Turner Trust and Turner LLC have been demanded to make, and have made, additional premium payments on the policies in their portfolios. Some of these payments occurred

before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**UU.      Husing 401K**

569.    Husing 401K purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $250,000 on or about November 11, 2013.

570.    The sales agent who sold Husing 401K the policies was Ralph Trigg.

571.    At the time of the purchase, Conestoga and Provident represented to Husing 401K that the life expectancies on the policies in its portfolio were 65, 51, 61, 48.5, 39, 48, 74, 36, and 72 months, respectively, and that the premium reserve periods on the policies were 77, 63, 91, 60.5, 51, 60, 86, 48, and 84 months, respectively.

572.    At some point, Conestoga unilaterally replaced five of the policies in the Husing 401K's portfolio without obtaining consent from Husing 401K.

573.    Husing 401K relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

574.    None of the policies in Husing 401K's portfolio have matured and paid a benefit.

575.    One of the policies in the Husing 401K did "mature" in that the insured person passed away, but even that policy turned out to be an illegal STOLI policy. Conestoga has not replaced the policy in the Husing 401K's portfolio.

576.    Husing 401K has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**VV.      Trice Trusts**

577.    Trice Trusts purchased interests in seven (7) Conestoga life settlement policies for an initial purchase price of $175,000 (split evenly between the two trusts that comprise Trice Trusts) on or about March 2014.

-74-

578.    The sales agent who sold Trice Trusts the policies was Kerry Morris of Assurance Financial Partners, LLC.

579.    At the time of the purchase, Conestoga and Provident represented to Trice Trusts that the life expectancies on the policies in their portfolios were 40, 40, 75, 75, 61, 33, and 81 months, respectively, and that the premium reserve periods on the policies were 52, 52, 87, 87, 91, 45, and 93 months, respectively.

580.    Trice Trusts relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

581.    None of the policies in Trice Trusts' portfolios have matured and paid a benefit.

582.    Trice Trusts have been demanded to make, and have made, additional premium payments on the policies in their portfolios. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**WW.    Hickey Estate**

583.    Dr. Michael Hickey, the decedent of the Hickey Estate, purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of $774,556.93 on or about April 2014.

584.    The sales agent who sold Dr. Hickey the policies was Stephen Gardner.

585.    At the time of the purchase, Conestoga and Provident represented to Dr. Hickey that the life expectancies on the policies in his portfolio were 74, 33, 86, 51, 75, 75, 40, 61, 81, and 40 months, respectively, and that the premium reserve periods on the policies were 86, 45, 98, 63, 87, 87, 52, 91, 93, and 52 months, respectively.

586.    Dr. Hickey relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

587.    Two of the policies in Dr. Hickey's portfolio have matured and paid a benefit.

588. Prior to his death, Dr. Hickey was demanded to make, and did make, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**XX.    Charles Anderson**

589. Charles Anderson purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of about $140,526 on or about December 11, 2014.

590. The sales agent who sold Anderson the policies was Jace McDonald.

591. At the time of the purchase, Conestoga and Provident represented to Anderson that the life expectancies on the policies in his portfolio were a certain number of months, respectively, and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy. Anderson does not recall the exact periods represented and does not have a copy of the PSS.

592. Anderson relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

593. None of the policies in Anderson's portfolio have matured and paid a benefit.

594. Anderson has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

595. Conestoga, Strategix, and Provident purported to forfeit Anderson's interest in at least one policy for not paying premiums demanded.

**YY.    John and Kathy Anker**

596. John and Kathy Anker purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of about $150,000 on or about December 8, 2015.

597. The sales agent who sold the Ankers the policies was Ralph Trigg.

598.    At the time of the purchase, Conestoga and Provident represented to the Ankers that the life expectancies on the policies in their portfolio were 70, 70, 81, 89, 34, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 82, 73, 101, 46, and 70 months, respectively.

599.    The Ankers relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolio, among other material misrepresentations and omissions.

600.    None of the policies in the Ankers' portfolio have matured and paid a benefit.

601.    The Ankers have been demanded to make, and have made, additional premium payments on the policies in their portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

602.    Conestoga, Strategix, and Provident purported to forfeit the Ankers' interest in at least one policy for not paying premiums demanded.

**ZZ.    David Kenney**

603.    David Kenney purchased an interest in eight (8) Conestoga life settlement policies for an initial purchase price of about $97,000 on or about March 14, 2016.

604.    The sales agents who sold Kenney the policies were Bill Grigorieff and Richard Salber.

605.    At the time of the purchase, Conestoga and Strategix represented to Kenney that the life expectancies on the policies in his portfolio were 70, 70, 61, 89, 34, 64, 67, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 82, 73, 101, 46, 76, 79, and 70 months, respectively.

606.    Kenney relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

607.    None of the policies in Kenney's portfolio have matured and paid a benefit.

608. Kenney has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**AAA.    Barbara Ogilvie**

609. Barbara Ogilvie purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of about $200,000 on or about November 4, 2013.

610. The sales agent who sold Ogilvie the policies was Ralph Trigg.

611. At the time of the purchase, Conestoga and Provident represented to Ogilvie that the life expectancies on the policies in her portfolio were 39, 35, 75, 48, 61, and 36 months, respectively, and that the premium reserve periods on the policies were 51, 47, 87, 60, 91, and 48 months, respectively.

612. Ogilvie relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

613. Only one of the policies in Ogilvie's portfolio has matured and paid a benefit. That policy matured shortly after Ogilvie invested. The proceeds from the one matured policy were reinvested into two additional Conestoga life settlement policies in or around May 2014. At the time of the reinvestment, Conestoga and Provident represented to Ogilvie that the life expectancies on the new policies in her portfolio were 51 and 81 months, respectively, and that the premium reserve periods on these policies were 63 and 93 months, respectively.

614. Ogilvie has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**BBB.    Karen Hunt**

615. Karen Hunt purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of about $300,000 on or about November 2013.

616.    The sales agent who sold Hunt the policies was Ralph Trigg.

617.    At the time of the purchase, Conestoga and Provident represented to Hunt that the life expectancies on the policies in her portfolio were 66, 39, 48, 61, and 36 months, respectively, and that the premium reserve periods on the policies were 78, 51, 60, 91, and 48 months, respectively.

618.    Hunt relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

619.    None of the policies in Hunt's portfolio has matured and paid a benefit.

620.    Hunt has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**CCC.    Larry Lycett**

621.    Larry Lycett purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of about $150,000 on or about April 28, 2016.

622.    The sales agent who sold Lycett the policies was Ralph Trigg.

623.    At the time of the purchase, Conestoga and Strategix represented to Lycett that the life expectancies on the policies in his portfolio were 70, 61, 89, 34, 67, and 58 months, respectively, and that the premium reserve periods on the policies were 82, 73, 101, 46, 79, and 70 months, respectively.

624.    Lycett relied on Conestoga and Strategix's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

625.    None of the policies in Lycett's portfolio have matured and paid a benefit.

626.    Lycett has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the

represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**DDD.    Helga Baker**

627.    Helga Baker purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of about $102,000 on or about May 20, 2014.

628.    The sales agent who sold Baker the policies was Bill Grigorieff.

629.    At the time of the purchase, Conestoga and Provident represented to Baker that the life expectancies on the policies in her portfolio were 75, 65, 76, 76, 51, and 81 months, respectively, and that the premium reserve periods on the policies were 87, 77, 88, 88, 63, and 93 months, respectively.

630.    Baker relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

631.    None of the policies in Baker's portfolio have matured and paid a benefit.

632.    Baker has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**EEE.    James Slater**

633.    James Slater purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of about $100,000 on or about January 30, 2013 (nine policies in an IRA account) and April 15, 2013 (five of the same nine policies in a non-qualified account).

634.    The sales agents who sold Slater the policies were Kerry Morris and Donald Thomas of Assurance Financial Partners, LLC.

635.    At the time of the purchase, Conestoga and Provident represented to Slater that the life expectancies on the policies in his portfolio were 39, 50.5, 55.5, 54, 55.5, 40.5, 44, 52, and 61 months, respectively, and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy.

636.    Two of the original policies in Slater's portfolio were replaced by Conestoga and Provident. One policy that appeared on Slater's original policy selection sheet was replaced in the confirmation letter. Then, in March 2015, Conestoga informed Slater that another policy had been "canceled," and this policy was later replaced with a different policy.

637.    Slater relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

638.    Only one of the policies in Slater's portfolio has matured and paid a benefit.

639.    Slater has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**FFF.    Michael C. Jackson**

640.    Michael C. Jackson purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of about $49,715 on or about January 7, 2015.

641.    The sales agent who sold Mr. Jackson the policies was Morgen Jackson.

642.    At the time of the purchase, Conestoga and Provident represented to Mr. Jackson that the life expectancies on the policies in his portfolio were 76, 62, 76, 49, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 61, 93, 86, and 84 months, respectively.

643.    Mr. Jackson relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

644.    None of the policies in Mr. Jackson's portfolio have matured and paid a benefit.

645.    Mr. Jackson has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**GGG.    Ingrid Jackson**

646.    Ingrid Jackson inherited her interest in the Conestoga life settlements when her mother, Erna Amon, passed away in 2017. Prior to her death, with Mrs. Jackson acting on her behalf under power of attorney, Amon purchased an interest in six (6) Conestoga life settlement policies for an initial purchase price of $198,429 on or about October 28, 2013

647.    The sales agent who sold Amon the policies was Morgen Jackson.

648.    At the time of the purchase, Conestoga and Provident represented to Amon and Mrs. Jackson that the life expectancies on the policies in Amon's portfolio were 65, 76, 62, 76, 49, and 81 months, respectively, and that the premium reserve periods on the policies were 77, 88, 74, 88, 61, and 93 months, respectively.

649.    Amon and Mrs. Jackson relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in Amon's portfolio, among other material misrepresentations and omissions.

650.    None of the policies in Amon's portfolio have matured and paid a benefit.

651.    Mrs. Jackson has been demanded to make, and has made, additional premium payments on the policies in Amon's portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**HHH.    Roger Macleod**

652.    Roger Macleod purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of about $29,000 on or about February 2014.

653.    The sales agent who sold Macleod the policies was Doc Gallagher.

654.    At the time of the purchase, Conestoga and Provident represented to Macleod that the life expectancies on the policies in his portfolio were 39, 35, 75, 48, and 61 months, respectively, and that the premium reserve periods on the policies were 51, 47, 87, 60, and 91 months, respectively.

655. Macleod relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

656. Only one of the policies in Macleod's portfolio has matured and paid a benefit.

657. Macleod has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**III.    Deborah Kirby**

658. Deborah Kirby purchased an interest in seven (7) Conestoga[5] life settlement policies for an initial purchase price of about $77,000 on or about July 23, 2010.

659. The sales agent who sold Kirby the policies was Doc Gallagher.

660. At the time of the purchase, Conestoga and Provident represented to Kirby that the life expectancies on the policies in her portfolio were 36, 39, 39.5, 37, 34.5, 43.5, and 42 months, respectively, and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy.

661. Kirby relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

662. Only two of the policies in Kirby's portfolio have matured and paid a benefit.

663. Kirby has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

---

[5] At the time, Conestoga was doing business under the name Trinity Settlement Services, LLC.

**JJJ.     Brian Craven**

664.    Brian Craven purchased an interest in four (4) Conestoga life settlement policies for an initial purchase price of about $25,000 on or about November 2014 or February 2015.

665.    The sales agent who sold Craven the policies was Paul Chojnacky.

666.    At the time of the purchase, Conestoga and Provident represented to Craven that the life expectancies on the policies in his portfolio were 89, 76, 76, and 49 months, respectively, and that the premium reserve periods on the policies were 101, 88, 88, and 61 months, respectively.

667.    Craven relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

668.    None of the policies in Craven's portfolio have matured and paid a benefit.

669.    Craven has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**KKK.     Michael Riccatone**

670.    Michael Riccatone purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of about $100,000 on or about March 6, 2015.

671.    The sales agent who sold Michael Riccatone the policies was Ralph Trigg.

672.    At the time of the purchase, Conestoga and Provident represented to Michael Riccatone that the life expectancies on the policies in his portfolio were 76, 62, 76, 49, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 61, 93, 86, and 84 months, respectively.

673.    Michael Riccatone relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in his portfolio, among other material misrepresentations and omissions.

674.    None of the policies in Michael Riccatone's portfolio have matured and paid a benefit.

675. Michael Riccatone has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**LLL.    Julie Riccatone**

676. Julie Riccatone purchased an interest in seven (7) Conestoga life settlement policies for an initial purchase price of about $100,000 on or about February 6, 2015.

677. The sales agent who sold Julie Riccatone the policies was Ralph Trigg.

678. At the time of the purchase, Conestoga and Provident represented to Julie Riccatone that the life expectancies on the policies in her portfolio were 76, 62, 76, 49, 81, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 88, 74, 88, 61, 93, 86, and 84 months, respectively.

679. Julie Riccatone relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

680. None of the policies in Julie Riccatone's portfolio have matured and paid a benefit.

681. Julie Riccatone has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**MMM.    Black Hawk**

682. Black Hawk purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of $242,702 on or about March 10, 2017.

683. The sales agent who sold Black Hawk the policies was Ralph Trigg.

684. At the time of his purchase, Conestoga and Strategix represented to Black Hawk Trust that the life expectancies on the policies in its portfolio were short and that the premium reserve periods on the policies were at least twelve months longer than the life expectancies on each policy.

685. Black Hawk relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

686. Only one of the policies in Black Hawk's portfolio has matured and paid a benefit.

687. Black Hawk has been demanded to make, and has made, additional premium payments on the policies in his portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the relevant policies, and some of these payments exceeded the estimated annual premium.

**NNN.     David and Karlene Blackburn**

688. David Blackburn purchased an interest in eleven (11) Conestoga life settlements for an initial purchase price of over $391,000 (ten in an IRA account and eleven in an independent account) on or about April 2011.

689. Karlene Blackburn purchased an interest in nine (9) Conestoga life settlements for an initial purchase price of about $57,622 on or about April 2011.

690. At the time of his purchase, Conestoga and Provident represented to David Blackburn that the life expectancies on the policies in his portfolio were 37, 39, 40.5, 50.5, 50.5, 50.5, 52, 51.5, 54, 55.5 and 55.5 months, respectively, and that the premium reserve periods on the policies were 73, 75, 76.5, 80.5, 86.5, 86.5, 88, 81.5, 84, 85.5, and 85.5 months, respectively.

691. At the time of her purchase, Conestoga and Provident represented to Karlene Blackburn that the life expectancies on the policies in her portfolio were 39, 40.5, 50.5, 50.5, 50.5, 52, 54, 55.5, and 55.5 months, respectively, and that the premium reserve periods on the policies were 75, 76.5, 80.5, 86.5, 86.5, 88, 84, 85.5, and 85.5 months, respectively.

692. The Blackburns relied on Provident and Conestoga's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

693. Only four of the policies in the Blackburns' respective portfolios have matured and paid a benefit, despite the life expectancies on all of the policies having been surpassed by multiple years on all of the policies.

694.    The Blackburns have been demanded to make, and have made, additional premium payments on the policies in their portfolios. Some of these payments occurred before the expiration of the represented premium reserve period on the policies, and some of these payments exceeded the estimated annual premium on the policies.

**OOO.    Lawson Trust**

695.    Lawson Trust purchased an interest in nine (9) Conestoga life settlement policies for an initial purchase price of about $50,000 on or about October 5, 2013.

696.    The sales agent who sold Lawson Trust the policies was Jeff Converse.

697.    At the time of the purchase, Conestoga and Provident represented to Lawson Trust that the life expectancies on the policies in its portfolio were 51, 39, 58, 48.5, 48, 61, 65, 74, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 51, 70, 60.5, 60, 91, 77, 86, and 84 months, respectively.

698.    Lawson Trust relied on Provident and Conestoga's representations regarding the life expectancies and premiums on the policies in its portfolio, among other material misrepresentations and omissions.

699.    Only one of the policies in Lawson Trust's portfolio has matured and paid a benefit. Another policy matured in that the insured person passed away, but the policy did not pay a benefit because it was determined to be an illegal STOLI policy.

700.    Lawson Trust has been demanded to make, and has made, additional premium payments on the policies in its portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the policies, and some of these payments exceeded the estimated annual premium on the policies.

701.    Conestoga, Strategix, and Provident also purported to forfeit Lawson Trust's interest in at least one policy for not paying premiums demanded.

**PPP.    Pam Cherry**

702.    Pam Cherry purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of about $50,000 on or about April 12, 2013.

703.   The sales agent who sold Cherry the policies was Kerry Morris of Assurance Financial Partners, LLC.

704.   At the time of the purchase, Conestoga and Provident represented to Cherry that the life expectancies on the policies in her portfolio were 39, 40.5, 50.5, 44, and 52 months, respectively, and the premium reserve periods on the policies were 75, 76.5, 80.5, 80, and 88 months, respectively.

705.   Cherry relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in her portfolio, among other material misrepresentations and omissions.

706.   Only one policy in Cherry's portfolio has matured and paid a benefit.

707.   Cherry has been demanded to make, and has made, additional premium payments on the policies in her portfolio. Some of these payments occurred before the expiration of the represented premium reserve period on the policies, and some of these payments exceeded the estimated annual premium on the policies.

**QQQ.   Janet and Doug Cheek**

708.   Janet Cheek purchased an interest in five (5) Conestoga life settlement policies for an initial purchase price of about $88,355 on or about September 12, 2013.

709.   Doug Cheek inherited an interest in nine (9) Conestoga life settlement policies in or around April 2015 after his mother, Mabel Cheek, passed away. Mabel Cheek, through the Mabel W. Cheek Trust ("Cheek Trust"), had purchased an interest in nine (9) Conestoga life settlements for an initial purchase price of $50,000 on or about November 2013.

710.   The sales agents who sold Janet Cheek and Cheek Trust the policies were Kerry Morris and Donald Thomas of Assurance Financial Partners, LLC.

711.   At the time of the purchase, Conestoga and Provident represented to Janet Cheek that the life expectancies on the policies in her portfolio were 51, 48.5, 61, 65, and 72 months, respectively, and that the premium reserve periods on the policies were 63, 60.5, 91, 77, and 84 months, respectively.

712.    At the time of the purchase, Conestoga and Provident represented to Cheek Trust that the life expectancies on the policies in its portfolio were 51, 39, 58, 48.5, 48, 61, 65, 74, and 72 months, respectively, and the premium reserve periods on the policies were 63, 51, 70, 60.5, 60, 91, 77, 86, and 84 months, respectively.

713.    Janet Cheek and Cheek Trust relied on Conestoga and Provident's representations regarding the life expectancies and premiums on the policies in their portfolios, among other material misrepresentations and omissions.

714.    None of the policies in the Cheeks' portfolios have matured and paid a benefit. One policy matured in that the insured person passed away, but the policy did not pay a benefit because it was determined to be an illegal STOLI.

715.    The Cheeks have been demanded to make, and have made, additional premium payments on the policies in their portfolios. Some of these payments occurred before the expiration of the represented premium reserve period on the policies, and some of these payments exceeded the estimated annual premium on the policies.

716.    Conestoga, Provident, and Strategix purported to forfeit the Cheeks' interests in at least one policy for not paying premiums demanded.

## VII.  CAUSES OF ACTION

### Count One: Civil Conspiracy

### (*By All Plaintiffs and Both Classes against All Defendants*)

717.    All previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

718.    McDermott, Conestoga, Provident, Bradford, Strategix, Provident, and JSS were each members of a combination of two or more persons.

719.    The object of the combination was to accomplish an unlawful purpose—to wit, to deceive and defraud investors, including Plaintiffs and other class members, into purchasing fractional interests in Conestoga life settlement contracts and into subsequently paying additional premium payments that were not disclosed or owed. Alternatively, the object of the combination was to accomplish a lawful purpose by unlawful means—to wit, to sell and maintain fractional

interests in Conestoga life settlements through the use of false and misleading representations and material omissions and to conceal discovery of the fraudulent conduct.

720. Defendants had a meeting of the minds on the object of the conspiracy. Each intended to participate, and in fact did participate, in the unlawful course of action.

721. The Defendants each committed multiple overt acts in furtherance of the conspiracy, including (but not limited to) providing and procuring life settlement contracts and false or misleading data about those contracts, producing, reviewing, and approving the PSS and other marketing materials, distributing the marketing materials to independent salespersons, convincing prospective investors to open and fund new financial accounts at Provident for purpose of purchasing the fractional interest in life settlement contracts, transferring interests in the life settlement contracts to investors, establishing escrow accounts related to the investments, making premium payments with investors' money that exceeded the amounts promised and disclosed to investors, paying commissions to sales agents and others, making demands on participants to pay additional premiums, and forfeiting interests of investors.

722. Strategix joined the conspiracy when it took over for Provident and Bradford and assisted McDermott and the Conestoga Entities in perpetrating and concealing the ongoing deception. Since taking over for Provident, Strategix has contributed to the dissemination of false and misleading information about the investments in the PSS and welcome letters, issued wrongful premium calls to investors, forfeited the beneficial interests of investors that did not pay demanded premiums, and failed to disclose material facts to investors relating to, among other things, the administration of the escrow accounts, payment of the premium payments, the status of the insurance policies, and the payment of commissions.

723. In addition or alternatively, Provident, Bradford, and Strategix gave assistance and encouragement to McDermott and Conestoga after discovering the torts being perpetrated on investors, and they hid the existence of the torts from investors, by (among other things) serving as agents for Conestoga; allowing McDermott and Conestoga to trade on their names and reputations; purporting to manage and oversee the escrow accounts; purporting to audit the escrow accounts; reviewing and approving the sales and marketing materials; overseeing and regulating

McDermott and Conestoga's activities; failing to notify Plaintiffs and other class members regarding the mismanagement and wrongful depletion of the escrow accounts; failing to notify Plaintiffs and the other class members that Provident and/or Bradford were no longer purporting to serve as escrow agent and auditor, respectively; and by failing to report the fraud despite a legal duty to do so.

724.    Plaintiffs and the class members suffered injuries as a proximate result of the conspiracy, including by purchasing the investments based on false pretenses, paying a higher amount than they otherwise might have paid, and being forced to pay additional premiums or else forfeit their beneficial interests in the policies.

**Count Two: Common Law Fraud**

***(By All Plaintiffs and Both Classes against All Defendants)***

725.    All previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

726.    McDermott, Conestoga, Provident, Strategix, Bradford, and JSS, either directly or by attribution, made material misrepresentations to Plaintiffs and other class members related to the marketing, sale, and service of fractional interests in the Conestoga life settlement contracts. These material misrepresentations were made in the PSS, other Conestoga marketing materials, and by sales agents authorized to act on behalf of Conestoga and Provident.

727.    The material misrepresentations include (but are not limited to) the life expectancies, premium reserve periods, estimated annual premiums, expected payouts at maturity, and age when premium calls would begin, stated on the PSS and welcome letters from Provident and/or Strategix; the representations that the investments were low risk and would "always win" and similar statements to that effect; the representations regarding the expected rate of return of the investments and similar statements to that effect; the representations that the life expectancies were "conservative" and similar statements to that effect; the representations that sales commissions would be limited to certain amounts and only paid to certain persons; and the representations that Defendants were completely "independent" and would provide "checks and balances" on one another and similar statements to that effect.

728.    Defendants either made these misrepresentations directly, or the statements are attributable to Defendants because they were made by persons with actual or apparent authority to act on behalf of Defendants, by persons actively engaged in a conspiracy with Defendants, or proximately and foreseeably resulted from Defendants' misrepresentations.

729.    These and other statements were material to reasonable investors in that they would likely affect a reasonable investor's decision whether to invest.

730.    These representations were either known to be false when made, were made without any intention of performing or honoring the promises being made, or were made with reckless disregard for their truth or falsity.

731.    Defendants made these false statements and promises with the intention that Plaintiffs and other class members would rely on them to their detriment.

732.    Plaintiffs and other class members did rely on these false representations in deciding to purchase the Conestoga life settlements and to continue paying premiums.

733.    Plaintiffs and other class members were injured as a result of these intentionally false and misleading representations and promises.

## **Count Three: Fraud by Non-Disclosure**

### *(By All Plaintiffs and Both Classes against All Defendants)*

734.    All previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

735.    McDermott, Conestoga, Provident, Bradford, Strategix, and JSS omitted, concealed, and otherwise failed to disclose material facts known to them that would have affected a reasonable investor's decision whether to invest with Conestoga.

736.    These material facts include (but are not limited to) that the insurance companies could and would increase the costs of insurance and annual premiums on the policies; that the policy illustrations for the policies showed that the annual premiums would increase substantially over time; that the escrow reserves would be insufficient to pay these increased premiums; that the life expectancies were systematically understated and substantially less than the Social Security data indicated; that the premium reserve period was substantially less than the life expectancy

predicted by the Social Security data; that the investors were highly likely to incur additional premium payments on the policies; that the beneficial interests would revert to Conestoga in the event that an investor defaulted on premium payments; that commissions would be paid to persons other than the investor's individual sales agent; that the Defendants had numerous undisclosed relationships and conflicts of interest, including relationships between and among Provident, Bradford, and Strategix; that McDermott, Provident, and JSS had been involved in the Retirement Value and/or Life Partners scams; that McDermott, JSS's principals, and Bradford's principals had been indicted on multiple felony charges; and that several Defendants—including McDermott, Conestoga, JSS, and Bradford—had been subject to adverse civil actions, including actions directly related to the sale of life settlements.

737.    Each Defendant had a duty to disclose these facts to Plaintiffs and other class members because (a) their own statements, or statements attributable to them, were false or otherwise created misconceptions among investors that gave rise to a duty to correct; (b) they actually knew that the investors were purchasing fractional interests in the life settlements based on a false understanding of material facts relating to the life settlements; (c) they owed fiduciary duties to the investors, including the duty of candor, the duty of loyalty, and the duty to make full disclosure; and/or (d) the information needed to ascertain the truth was available to these Defendants and was not reasonably available to investors.

738.    These undisclosed facts were material to any reasonable person considering purchasing an interest in Conestoga life settlements in that they likely would affect a reasonable person's decision about whether to invest.

739.    Defendants knew that the Plaintiffs and the other class members were ignorant of the undisclosed facts and did not have an equal opportunity to discover the truth regarding the undisclosed facts.

740.    Defendants were deliberately silent despite having a duty to disclose to Plaintiffs and other class members the truth regarding the undisclosed facts.

741.    By failing to disclose the facts, Defendants intended to induce Plaintiffs and the other class members to act or refrain from acting.

742.    Plaintiffs and other class members reasonably relied on the Defendant's non-disclosure to their detriment by deciding to purchase the investments, which they would not have done had they been apprised of the undisclosed facts before investing.

743.    Plaintiffs and other class members were injured as a result of acting without the knowledge of the undisclosed facts.

### Count Four: Breach of Fiduciary Duty

*(By All Plaintiffs and Both Classes against Conestoga Trust Services LLC, Provident, Strategix, and Bradford)*

744.    All previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

745.    A fiduciary owes duties of loyalty, complete honesty, full disclosure and transparency, and must put the interest of its beneficiaries ahead of its own selfish interest in all circumstances relating to the fiduciary relationship.

746.    Conestoga Trust Services LLC, Provident, Strategix, and Bradford, owed fiduciary duties to Plaintiffs and the other class members because they occupy or occupied positions of trust and confidence with respect to the Conestoga investments.

747.    Conestoga Trust Services LLC owes fiduciary duties to Plaintiffs and the other class members because it serves as the trustee of the Conestoga Settlement Trust. According to the PPM, the Conestoga Settlement Trust was "established . . . for the purpose of holding life settlement policies *for the benefit of the participants* in such policies." A trustee is a fiduciary as a matter of law. In addition, Plaintiffs and other class members placed trust and confidence in Conestoga Trust Services LLC in relation to its service as trustee.

748.    Provident owes fiduciary duties to Plaintiffs and the other class members because it was entrusted to serve as the "independent escrow agent" for investors and supervise over the escrowed funds belonging to investors. An escrow agent is a fiduciary as a matter of law. In addition, Plaintiffs and other class members placed trust and confidence in Provident in relation to its service as escrow agent.

749.    Bradford owes fiduciary duties to Plaintiffs and the other class members because Bradford was entrusted to serve as independent auditor for the escrow accounts. An independent auditor is a fiduciary as a matter of law. In addition, Plaintiffs and other class members placed trust and confidence in Bradford in relation to its service as escrow auditor.

750.    Strategix owes fiduciary duties to Plaintiffs and the other class members because Strategix was entrusted to manage the Conestoga investments as administrator for the Conestoga investments after Provident abandoned its responsibilities. Plaintiffs and other class members placed trust and confidence in Strategix in relation to its service as administrator.

751.    Conestoga Trust Services LLC, Provident, Bradford, and Strategix breached these fiduciary duties by, among other things, participating in a scheme to defraud Plaintiffs and the class members, making false representations, spending funds from the escrow accounts for purposes (and in amounts) that were not disclosed to Plaintiffs and/or authorized by Plaintiffs, paying premiums with money that belonged to Plaintiffs and was not owed by Plaintiffs, improperly managing escrow funds, failing to disclose conflicts of interest and other material facts discussed above, engaging in self-dealing, paying themselves excessive and undisclosed commissions, and assisting in a cover-up to keep Plaintiffs from discovering the scheme.

752.    These breaches of fiduciary duty proximately caused injuries to the Plaintiffs and the class members. These breaches of fiduciary duty also resulted in benefits to Conestoga Trust Services LLC, Provident, Bradford, and Strategix, including direct pecuniary benefits through fees and commissions at the expense of the Plaintiffs and the class members.

### Count Five: Federal Securities Fraud (Rule 10b-5)

*(By the Securities Fraud Class and Plaintiffs in Said Class against All Defendants)*

753.    The previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

754.    Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce and the mails, employed a device, scheme, or artifice to defraud; and made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and

engaged in acts, practices and course of business which operates or would operate as a fraud or deceit upon Plaintiffs and other class members.

755.   These false and misleading statements, acts, practices, omissions, devices, schemes, or artifices to defraud occurred in connection with the sale or offer to sell investments in Conestoga life settlement contracts, which are securities as defined in section 3(a)(1) of the Securities and Exchange Act and elsewhere under federal law.

756.   The false and misleading statements include (but are not limited to) the life expectancies, premium reserve periods, estimated annual premiums, expected payouts at maturity, and age when premium calls would begin, stated on the PSS and welcome letters from Provident and/or Strategix; the representations that the investments were low risk and would "always win" and similar statements to that effect; the representations regarding the expected rate of return of the investments and similar statements to that effect; the representations that the life expectancies were "conservative" and similar statements to that effect; the representations that sales commissions would be limited to certain amounts and only paid to certain persons; and the representations that Defendants were completely "independent" and would provide "checks and balances" on one another and similar statements to that effect.

757.   The material omissions include (but are not limited to) that the insurance companies could and would increase the costs of insurance and annual premiums on the policies; that the policy illustrations for the policies showed that the annual premiums would increase substantially over time; that the escrow reserves would be insufficient to pay these increased premiums; that the life expectancies were systematically understated and substantially less than the Social Security data indicated; that the premium reserve period was substantially less than the life expectancy predicted by the Social Security data; that the investors were highly likely to incur additional premium payments on the policies; that the beneficial interests would revert to Conestoga in the event that an investor defaulted on premium payments; that commissions would be paid to persons other than the investor's individual sales agent; that the Defendants had numerous undisclosed relationships and conflicts of interest, including relationships between and among Provident, Bradford, and Strategix; that McDermott, Provident, and JSS had been involved in the Retirement

Value and/or Life Partners scams; that McDermott, JSS's principals, and Bradford's principals had been indicted on multiple felony charges; and that several Defendants—including McDermott, Conestoga, JSS, and Bradford—had been subject to adverse civil actions, including actions directly related to the sale of life settlements.

758.    These false and misleading statements and material omissions were made with knowledge of their falsity or reckless disregard for their truth and with the intent that the Plaintiffs and other class members would rely on them to their detriment.

759.    Plaintiffs and other members reasonably relied on these false and misleading statements in purchasing the Conestoga life settlements. In addition, or in the alternative, Plaintiffs and other class members would not have purchased the Conestoga life settlements had they been timely informed of the undisclosed facts.

760.    Plaintiffs and other class members suffered economic loss as a result of the Defendants' false and misleading representations and material omissions, including the loss of their purchase money, expected profits, and moneys paid for additional premiums. In addition, some Plaintiffs and other class members have forfeited their investments.

761.    The economic loss described above was proximately caused by Defendants' false and misleading representations and material omissions. These losses would not have occurred but for Defendants' false and misleading representations and material omissions, and the losses were the foreseeable consequence of the Defendants' misrepresentations and omissions.

### Count Six: Nevada Securities Fraud (NRS 90.570)

*(By the Securities Fraud Class and Plaintiffs in Said Class against All Defendants)*

762.    The previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

763.    Defendants, in connection with the offer to sell, sale, offer to purchase or purchase of a security, directly or indirectly, employed a device, scheme or artifice to defraud; made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements not misleading in the light of the circumstances under which they were made; or

engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon Plaintiffs and other class members.

764. The false and misleading statements or material omissions were made in connection with the sale or offers to sell investments in Conestoga life settlements, which are securities as defined under Nevada law.

765. The false and misleading statements include (but are not limited to) the life expectancies, premium reserve periods, estimated annual premiums, expected payouts at maturity, and age when premium calls would begin, stated on the PSS and welcome letters from Provident and/or Strategix; the representations that the investments were low risk and would "always win" and similar statements to that effect; the representations regarding the expected rate of return of the investments and similar statements to that effect; the representations that the life expectancies were "conservative" and similar statements to that effect; the representations that sales commissions would be limited to certain amounts and only paid to certain persons; and the representations that Defendants were completely "independent" and would provide "checks and balances" on one another and similar statements to that effect.

766. The material omissions include (but are not limited to) that the insurance companies could and would increase the costs of insurance and annual premiums on the policies; that the policy illustrations for the policies showed that the annual premiums would increase substantially over time; that the escrow reserves would be insufficient to pay these increased premiums; that the life expectancies were systematically understated and substantially less than the Social Security data indicated; that the premium reserve period was substantially less than the life expectancy predicted by the Social Security data; that the investors were highly likely to incur additional premium payments on the policies; that the beneficial interests would revert to Conestoga in the event that an investor defaulted on premium payments; that commissions would be paid to persons other than the investor's individual sales agent; that the Defendants had numerous undisclosed relationships and conflicts of interest, including relationships between and among Provident, Bradford, and Strategix; that McDermott, Provident, and JSS had been involved in the Retirement Value and/or Life Partners scams; that McDermott, JSS's principals, and Bradford's principals

had been indicted on multiple felony charges; and that several Defendants—including McDermott, Conestoga, JSS, and Bradford—had been subject to adverse civil actions, including actions directly related to the sale of life settlements.

767. These false and misleading statements and material omissions were made with knowledge of their falsity or reckless disregard for their truth and with the intent that the Plaintiffs and other class members would rely on them to their detriment.

768. Plaintiffs and other members reasonably relied on these false and misleading statements in purchasing the Conestoga life settlements. In addition, or in the alternative, Plaintiffs and other class members would not have purchased the Conestoga life settlements had they been timely informed of the undisclosed facts.

769. Plaintiffs and other class members suffered economic loss as a result of the Defendants' false and misleading representations and material omissions, including the loss of their purchase money, expected profits, and moneys paid for additional premiums. In addition, some Plaintiffs and other class members have forfeited their investments.

770. The economic loss described above was proximately caused by Defendants' false and misleading representations and material omissions. These losses would not have occurred but for Defendants' false and misleading representations and material omissions, and the losses were the foreseeable consequence of the Defendants' misrepresentations and omissions.

**Count Seven: Equitable Accounting**

***(By All Plaintiffs and Both Classes against Conestoga, Provident, and Strategix)***

771. The previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

772. Plaintiffs seek an equitable accounting of all funds paid by members of the class relating to the acquisition and maintenance of the life settlement investments and other information necessary to evaluate the viability and enforceability of the underlying policies.

773. Plaintiffs seek to require these Defendants (and their agents, affiliates, and those under their control and supervision) to fully and properly account for all money provided to them

(or paid at their direction or instruction), or otherwise paid, invested, or deposited by Plaintiffs and the class related to the Conestoga life settlements.

774. These Defendants must also fully and properly account for all fees, commissions, charges, and other monetary compensation that they paid to themselves or others from the money entrusted to them by Plaintiffs and the class.

775. These Defendants must also account for all money spent to purchase, maintain, or otherwise finance the costs of the underlying insurance policies, including, but not limited to premiums paid in whole or in part using funds paid by Plaintiffs or the class.

776. These Defendants must also account for all life insurance benefits paid out by any and all life insurance companies relating to the underlying life insurance policies that are attributable in whole or in part to Plaintiffs or the class.

777. These Defendants must also account for the beneficial ownership history, status, enforceability, payments made, maturities, life expectancies, premium illustrations, policy terms, and other information necessary to assess the viability and enforceability of the policies held in trust for the benefit of Plaintiffs or the class.

### Count Eight: Declaratory Judgment (28 U.S.C. § 2201)

#### *(By All Plaintiffs against Conestoga and Strategix)*

778. The previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

779. There is an immediate justiciable controversy regarding whether, and to what extent, Plaintiffs should be required to pay ongoing insurance charges and premiums relating to the underlying insurance policies. In particular, Conestoga and Strategix continue to demand that Plaintiffs make payments on account of premiums allegedly owed on the underlying insurance policies. The premiums demanded are not consistent with the representations regarding timing and amount of premiums made at the time of sale.

780. Therefore, Plaintiffs seek the following judicial declarations: (1) Defendants have wrongfully demanded that Plaintiffs pay insurance costs and premiums that were not disclosed; (2) Plaintiffs shall not be required to pay and *do not owe* insurance charges, including premium

payments, that were not disclosed or otherwise exceed what was disclosed in the PSS; (3) to the extent Plaintiffs may incur any obligation to pay additional insurance costs or premiums in the future, such payment obligations shall only begin, if at all, after the date the premium reserves were set to expire on the respective policy for which premiums are demanded, in accordance with the PSS; (5) any premium obligations that Plaintiffs may incur shall be offset by the amount by which such Plaintiffs have already paid additional premiums earlier, or in excess of, those stated in the PSS; and (6) Defendants shall not forfeit any Plaintiff's interest for failing to pay premiums that are not consistent with such Plaintiff's PSS and any purported forfeiture of such interest for such reason shall be null and void and the interest reinstated.

### Count Nine: Receivership

***(By All Plaintiffs and Both Classes against Conestoga, Strategix, and Provident)***

781.    The previous and subsequent assertions and allegations are each incorporated herein by reference as if they were each fully re-alleged in this section.

782.    Federal courts have inherent authority to impose receiverships in securities fraud actions to prevent further dissipation of defrauded investors' assets. In addition, under Nevada law, a receiver may be appointed in all cases where receivers have heretofore been appointed by the usages of the courts of equity.

783.    Relevant factors include (a) whether the party seeking the appointment has a valid claim; (b) whether there is fraudulent conduct or the probability of fraudulent conduct by the defendant; (c) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (d) whether legal remedies are inadequate; (e) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (f) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and (g) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership.

784.    Plaintiffs have multiple valid claims against Defendants and, for the reasons stated above, are likely to show that Defendants have engaged in fraudulent conduct.

785. The funds and life insurance assets held in trust, ostensibly for Plaintiffs' benefit, are at imminent risk of being lost, concealed, diminished, or squandered because these assets are currently being managed behind a veil of secrecy by persons that have repeatedly engaged in fraudulent conduct and been criminally charged for crimes of moral turpitude, including fraud.

786. Legal remedies are inadequate because the life insurance assets cannot be restored if they lapse and Defendants likely cannot compensate Plaintiffs for the losses they are likely to sustain if the life insurance assets lapse. In addition, Plaintiffs have suffered and continue to suffer irreparable harms through the loss and/or unavailability of their retirement savings.

787. Plaintiffs would benefit from the appointment of a receiver to safeguard the life insurance assets and funds held in trust and to provide trustworthy reports and accounting related to those assets. Defendants would suffer no harm from appointment of the receiver.

788. Plaintiffs' interests would be well-served by appointment of a receiver.

## VIII.  JURY DEMAND

789. Plaintiffs hereby demand a jury trial as to all issues that may be tried to a jury under the Seventh Amendment to the United States Constitution and other applicable law.

## IX.  RELIEF SOUGHT

790. Plaintiffs seek to recover monetary and non-monetary damages, including, but not limited to, all expectancy damages, reliance damages, consequential damages, and other direct and indirect damages that are allowed by law or equity. Plaintiffs also seek to disgorge Defendants of all benefits that they received as a result of their misconduct, including any beneficial interest that any Defendant may own (or purport to own) in the Conestoga life settlement contracts.

791. In the alternative, Plaintiffs seek to recover out of pocket and/or rescission damages, and Plaintiff seek to rescind their investments and payments, so as to be put back into the position they were each in prior to making any investments.

792. Defendants acted with malice and willful intent to harm Plaintiffs and, therefore, Plaintiffs seek to recover punitive and exemplary damages.

793. To the extent allowed by law, Plaintiffs seek to recover attorneys' fees and litigation costs, as well as all pre- and post-judgment interest.

794.    Plaintiffs seek total monetary relief, on behalf of the class, in excess of $10,000,000.

795.    Plaintiffs seek to recover any and all preliminary or permanent relief under law or equity that is just and appropriate under the circumstances, including a full accounting declaratory relief, and appointment of a receiver to manage the Conestoga Trust.

## X.  JURY DEMAND

796.    Plaintiff demands a jury trial on all issues that may be tried before a jury in this matter and has submitted the jury fee.

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief on account of the claims in this action:

    a.  Certify the class and subclasses defined herein and appoint the undersigned counsel as class counsel;

    b.  Serve notice on the class in accordance with the Federal Rules;

    c.  Enter judgment against the Defendants on all of the claims;

    d.  Award actual damages (including, but not limited to, direct and indirect damages, lost profits, consequential damages, reliance damages, expectancy damages, and/or out-of-pocket damages);

    e.  Award exemplary or punitive damages to be paid by Defendants to Plaintiffs;

    f.  Disgorge Defendants' ill-gotten gains and award the same to Plaintiffs;

    g.  As an alternative to damages, grant rescission and return to Plaintiffs all funds that have been paid in relation to the Conestoga life settlement investments;

    h.  Enjoin the Defendants from continuing their wrongful conduct;

    i.  Grant the declaratory relief requested herein;

    j.  Grant preliminary and permanent injunctive relief, including appointment of a receiver to manage the Conestoga Trust and escrow accounts containing investor funds for the benefit of investors;

    k.  Award Plaintiffs their attorneys' fees and costs of suit;

-103-

l.  Award pre-judgment and post-judgment interest on any moneys to be paid to Plaintiffs or the class at the highest permissible rate;

m.  Award the class representatives an incentive award for bringing this claim on behalf of a class of similarly situated persons; and

n.  Grant such other relief to which Plaintiffs may be justly entitled, whether at law or in equity.

DATED: September 16, 2020                    REESE MARKETOS LLP


By     _____/s/ Adam Sanderson_____
ADAM SANDERSON
Texas Bar No. 24056264
(*Will comply with LR IA 11-2 within 1 day*)
BRETT S. ROSENTHAL
Texas Bar No. 24080096
(*Will comply with LR IA 11-2 within 1 day*)
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201


KING & DURHAM PLLC


By     _____/s/ Matthew L. Durham_____
GREGORY H. KING
Nevada Bar No. 7777
MATTHEW L. DURHAM
Nevada Bar No. 12060
6385 S. Rainbow Blvd., Suite 220
Las Vegas, Nevada 89118

ATTORNEYS FOR PLAINTIFFS